[Crim. No. 6199. In Bank. Sept. 19, 1958.]

THE PEOPLE, Respondent, v. MANUEL JOE CHAVEZ
et al., Appellants.

[Crim. No. 6210. In Bank. Sept. 19, 1958.]

THE PEOPLE, Respondent, v. MANUEL HERNANDEZ,
Appellant.

Richard Gladstein, under appointment by the Supreme Court, Joseph T. Forno, Harold J. Ackerman and Ward Sullivan for Appellants.

Edmund G. Brown, Attorney General, Norman H. Sokolow and Albert Bianchi, Deputy Attorneys General, for Respondent.

GIBSON, C. J.—A jury found defendants Manuel Chavez, Clyde Bates, and Manuel Hernandez guilty of murder of the first degree as charged in six counts. The punishment of Bates and Chavez was fixed at death and that of Hernandez

at life imprisonment. The jury further found that each of the three defendants was guilty of arson and that, as alleged, Bates had suffered four prior convictions. The appeals of Bates and Chavez are before us automatically under section 1239, subdivision (b), of the Penal Code. Separate notice of appeal was filed by Hernandez.

A fourth man, Oscar Brenhaug, was charged with the same offenses, but the indictment was set aside as to him on the ground that he had been indicted without reasonable or probable cause. (See Pen. Code, § 995.)

About 11 p. m. on April 4, 1957, six persons died as a result of a fire in a Los Angeles bar called the Mecca. Five were killed by carbon monoxide, and the death of the sixth was caused by asphyxia and burns. During the morning and afternoon of that day Bates and Brenhaug consumed considerable amounts of alcoholic beverages, including wine, beer, bourbon, and tequila. Early in the evening they met Chavez and Hernandez, who joined them in heavy drinking. Later they went to the Corner Café, and then they drove in Chavez' car to the Mecca bar where they ordered more drinks. Hernandez, who was 18 years old, was asked for his identification card and said he did not have it. Chavez was also asked for his card and refused to show it. The bartender, believing Chavez and Hernandez might be minors, refused to fill their orders. The evidence appears to be without conflict that all of the defendants were under the influence of alcohol.

A disturbance arose which apparently developed in part out of the refusal of a waitress and another woman to dance with some of the defendants. The bartender, with the assistance of a patron, ejected Chavez, Bates and Hernandez, and there was considerable fighting both inside and outside the building, during which Chavez was knocked down. A few minutes later Chavez returned for Brenhaug, who had remained inside, and Chavez was again knocked down and ejected. Brenhaug, who was in a drunken stupor during the disturbance, left when he was told to do so. There is a conflict in the evidence as to whether Hernandez took any part in the fight. An employee of the Mecca testified that Bates and Chavez reentered to get Brenhaug and that when the latter got up to leave, one of them said, ''We'll be back, and we'll get even.'' Another witness heard one of the defendants say, ''We will be back.''

At the trial Brenhaug testified: He and defendants drove away from the Mecca in Chavez' automobile but soon parked it and got into one owned by Bates. They stopped to pick up

a 5-gallon paint bucket, drove to a gasoline station, and parked the car on a street nearby. Hernandez and Bates went into the station, with Bates carrying the bucket, and bought some gasoline. (According to the station attendant the amount purchased was nearly five gallons.) Bates took the bucket back to the car and put it in the front compartment between his legs, and Hernandez drove them back to the vicinity of the Mecca. Before starting the trip to the gasoline station either Bates or Chavez said "they were going back and get even with them," and when Bates got out to pick up the bucket one of the defendants "said they were going back to the Mecca and fix them people back there." Thereafter, on the way to the station, Bates said that "we were going to get some gas and go back and scare them." When they returned to the Mecca Brenhaug got out of the car and said that he did not want to get into any trouble. Bates seized him and shoved him into the passenger side of the front seat. Bates and Chavez left the automobile, with Bates carrying the bucket of gasoline. The engine of the car was running, and Hernandez was seated behind the steering wheel.

When Bates and Chavez arrived at the door of the Mecca, Bates threw the gasoline on the floor, and the waitress heard him say, "I will get every one of you in there." Chavez threw a book of lighted matches on the gasoline, and there followed an explosion or flash fire which traveled rapidly, destroying the carpeting and damaging the interior. Bates and Chavez ran from the Mecca and got into the rear seat of the car, saying, "Let's get out of here." They left immediately, with Hernandez driving.

Defendants and Brenhaug drove to the Corner Café, and en route the bucket was thrown out of the car. All of them except Brenhaug, who remained in the car and slept, went into the café and stayed there until closing time. They separated soon after, and Bates and Brenhaug drove to Bates' residence, where they parked in the driveway and went to sleep. Officers took Bates and Brenhaug into custody about 3:10 in the morning. Bates did not stagger and, in the opinion of one of the officers, was not intoxicated. The officer noticed a smell of gasoline on the inside of the car when he opened the door. A chemist who examined the automobile about two hours later detected odors of gasoline and wine on the passenger side of the floor of the front compartment.

Bates was questioned by a police officer at about 4 a. m. on April 5. He said that he had been at the Mecca with Brenhaug

the evening before but that he did not know the identity of the other two men and that they had come in later. Chavez was placed under arrest at his home by two police officers on the afternoon of the same day, and, before they indicated why they were there, he said, "I have been expecting you all day." He requested his wife to get him a lawyer, stating, "I didn't do it." When she asked him what he was talking about he replied, "That thing in the bar with all those people, the one you read about in the paper. I was in the bar."

Hernandez told two police officers, when questioned on the morning of April 6, that two men whose names he did not know picked him up in an automobile and drove him to the bar where "all of those people were burned" and that after an argument with the bartender they left and went home. Later he acknowledged that they had gone to a filling station where he purchased gasoline. He said that he bought the gasoline because Bates told him to get it, but he did not know then what Bates was going to do with it; that he drove the car when they left the gasoline station; that he did not want to go back to the Mecca, but Bates "kept" telling him to go there and gave him directions; and that Bates sat in the front seat, with the gasoline container near his feet. Bates and Chavez got out of the car at the Mecca, with Bates carrying the gasoline. After a couple of minutes, they came running back to the car, and the place was on fire.

On April 9, Bates, Chavez, Hernandez and Brenhaug were questioned together in the police administration building. Brenhaug stated: Defendants "got into a fight" at the Mecca, and Bates and Chavez said that they were going to "get even." After the four of them left the Mecca, Bates and Chavez picked up a can, and Bates drove to a filling station where Hernandez purchased gasoline. Bates said they would return to the Mecca and throw some gasoline into the place. They parked near the Mecca, and Bates and Chavez got out of the car, taking the can with them. Hernandez was in the front seat behind the steering wheel. He (Brenhaug) saw a flash of light, and Bates and Chavez came running back to the car, saying they should "get out of there." Either Bates or Chavez said, "We sure fixed them," and they left, with Hernandez driving.

The police, in the presence of Brenhaug, questioned defendants about his statement. Hernandez said that Brenhaug was mixed up a little in some places but had told the truth about what had occurred and that, when something was said about

buying gasoline, he (Hernandez) thought they were only going to "scare somebody or something." Bates said he remembered that he and Brenhaug had picked up Chavez and Hernandez, that they had gone to the Mecca and had had a "beef" there, and that he was at the Corner Café about closing time with Chavez and Hernandez, but that he did not recall anything else. Chavez said that Brenhaug and Hernandez were lying.

Hernandez did not take the stand at the trial. Bates testified that commencing on the morning of April 4 and continuing into the evening, he and Brenhaug drank considerable amounts of alcoholic beverages. He recalled going to the Mecca, but it was "more of a dream." He did not remember returning to the Mecca, and, if he threw gasoline there, he did not remember it.

Chavez testified that he was at the Mecca during the first visit and was ejected; that the three others left in Bates' automobile; that he entered his own car and drove away; and that he did not see Bates, Hernandez, or Brenhaug again that night or the following morning, nor did he return to either the Mecca or the Corner Café.

Defendants have filed separate briefs, and, although their claims of error differ in some respects, their principal contentions may be summarized as follows: (1) the evidence is insufficient to support a finding that murder was committed in the perpetration of arson, and the court erred in instructing the jury on the subject; (2) the evidence is insufficient to support a finding that murder was perpetrated by means of torture, and the court erred in instructing the jury on that issue; (3) it was error to refuse instructions requested by defendants on second degree murder and manslaughter; (4) errors were committed in the admission of evidence; and (5) the district attorney was guilty of prejudicial misconduct.

It is the position of the prosecution that the evidence shows that the homicides were committed in the perpetration of arson and by means of torture and, therefore, constituted murder of the first degree under section 189 of the Penal Code.[1] The jury was instructed on that theory.

---

[1]Section 189 of the Penal Code provides:

"All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

The burning of a building such as the one in which the Mecca was located comes within section 448a of the Penal Code, which makes it a crime for a person to wilfully and maliciously burn any building not a parcel of a dwelling.[2] The word "arson" does not appear in this section but in section 447a, which provides that any person who wilfully and maliciously sets fire to a dwelling or an adjoining building is guilty of arson.[3]

Defendants argue that only the offense proscribed by section 447a constitutes arson and that section 448a, under which they were charged, sets forth a different offense. This argument was rejected in the case of *In re Bramble,* 31 Cal.2d 43 [187 P.2d 411], where the defendant was accused of having set fire to store buildings, and the court said, "This contention is based on an untenably (in California) narrow meaning of the word 'Arson.'" (31 Cal.2d at p. 48.) After setting forth the history of the word "arson," the opinion further states: "It thus appears that there are ample historical and legal bases for designating the acts enumerated in section 448a as 'arson.' The real purpose of differentiating the acts listed in section 448a from those included in section 447a is apparently not to change the nomenclature but to provide a convenient method of pleading and identifying the two classes of acts which are deemed to merit different punishments. . . . For the foregoing reasons it is obvious that the use of the word 'arson' in the indictment and in the judgments is not inconsistent with the specification that the offenses were committed by the burning of store buildings." (31 Cal.2d at p. 50.)

Although the Bramble case did not involve construc-

[2]Section 448a of the Penal Code provides:

"Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any barn, stable, garage or other building, whether the property of himself or of another, not a parcel of a dwelling house; or any shop, storehouse, warehouse, factory, mill or other building, whether the property of himself or of another; or any church, meeting house, courthouse, work house, school, jail or other public building or any public bridge; shall upon conviction thereof, be sentenced to the penitentiary for not less than one nor more than ten years."

[3]Section 447a of the Penal Code provides:

"Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, shall be guilty of arson, and upon conviction thereof, be sentenced to the penitentiary for not less than two nor more than twenty years."

tion of the word "arson" as used in section 189 of the Penal Code, there is no sound basis for concluding that the word as used in that section is not intended to apply to the offense dealt with in section 448a. From 1850 to 1872 the burning of any building was by statute expressly denominated arson, and any homicide resulting from such burning was murder. (Stats. 1850, pp. 229, 234-235, as amended by Stats. 1856, pp. 131, 132, 219.) When section 189 was adopted in 1872 the Legislature provided that the burning of any building capable of affording shelter to a human being, whether or not a dwelling, constituted arson. (Former Pen. Code, § 447 et seq.) These provisions remained substantially unchanged until 1929 when sections 447a and 448a were adopted. Section 448a was placed in the chapter entitled "Arson," and the 1929 amendments contained nothing to indicate that the offense described by that section should no longer be regarded as arson. The Legislature did not qualify the word "arson" as used in section 189, nor has it done so since 1929, even though the section was amended in other respects subsequent to the decision of the Bramble case in 1947. On the other hand in section 644 of the Penal Code, which relates to prior offenses of an habitual criminal, the Legislature made such a qualification in 1945 when it limited the offense of "arson" to "arson as defined in section 447a," thereby impliedly recognizing that, unless qualified, the word "arson" in a provision such as section 189 includes offenses of the type described in section 448a as well as those set forth in section 447a. (See *In re Bramble,* 31 Cal.2d 43, 50 [187 P.2d 411].)

 The evidence is clearly sufficient to support a finding that defendants wilfully and maliciously set fire to the building and that the murders were committed in the perpetration of arson within the meaning of section 189.

 The trial court was also justified in giving instructions regarding murder perpetrated by means of torture. Murder is so perpetrated when the intent is to cause cruel suffering for the purpose of revenge, and where a man killed his wife by burning her with gasoline it was held that the jury could reasonably conclude that his intention was to inflict cruel suffering. (*People* v. *Martinez,* 38 Cal.2d 556, 561 [241 P.2d 224].)

 As we have seen, statements were made during the trip to purchase gasoline which could be interpreted as indicating that defendants were motivated by revenge, and, when the fire

was set, Bates said, "I will get every one of you in there." There were a number of people visible in the Mecca from the doorway when the gasoline was thrown on the floor, and one patron was so close that his leg was hit by gasoline and burned. The death of one of the victims, who had been at the bar, was caused by asphyxia and by third and fourth degree burns involving the entire body surface, and the jury could reasonably have concluded that he suffered pain from burning. The evidence is amply sufficient to warrant instructions on the theory that murder was committed by means of torture.

Hernandez contends that there is no evidence to support his conviction of murder in connection with either arson or torture, and he points to testimony to the effect that he was a mere onlooker and did not participate in the fighting at the time of the first visit to the Mecca or in the subsequent throwing of gasoline. There was other testimony, however, to the effect that he joined in the fighting outside the door after he was ejected from the bar and that he admitted buying the gasoline. One witness testified that she saw Hernandez at the door just before Chavez threw the lighted book of matches. Hernandez drove the car from the gasoline station to the Mecca and, subsequently, away from the scene of the fire. It could be inferred that he knew that the purpose of the gasoline purchase was to "get even" with the people at the Mecca and that he knew that the gasoline was to be lit. The jury was entitled to find that he was guilty of murder both in the perpetration of arson and by means of torture.

In support of the claim that the court erred in refusing to instruct regarding manslaughter and murder of the second degree, defendants assert that the jury was thus precluded from finding that they were so intoxicated that they could not form the specific intent which is a necessary element of the crimes of arson and murder by torture. The issues of intent and intoxication were submitted to the jury by the court's instructions, and it is obvious that these issues were decided against defendants in a manner which prohibited a finding of a lesser offense than murder of the first degree. The court instructed the jury that specific intent is a necessary element of arson and murder by means of torture, that there must be an inquiry into the state of mind of defendants at the time the alleged acts were committed, that in this connection the evidence of intoxication must be considered, and that the degree of intoxication might be such as to render a person

incapable of forming the necessary intent. ■ We must, of course, presume that the jury followed these instructions in returning a verdict of guilty on the count of arson against each of the defendants, and since it was established that the homicides were caused by the fire, the provisions of section 189 of the Penal Code required convictions of first degree murder.

Bates and Chavez contend that the court erred in admitting evidence relative to the conversation on April 6 between Hernandez and two police officers and the conversation on April 9 when Brenhaug and the three defendants were questioned in the police administration building. ■ Where statements of a defendant are admitted which are irrelevant or unnecessary in establishing a case against him and are extremely prejudicial and inadmissible hearsay as to a codefendant, they should be excluded from the evidence. ■ But where the statements are relevant to the defendant, and the jury is instructed that the evidence is admitted only as to him, it will ordinarily be presumed that the jury followed the instruction and that there was no prejudice as to the codefendant. (See *People* v. *Foote,* 48 Cal.2d 20, 23 [306 P.2d 803].)

■ The April 6 conversation with Hernandez, which was admitted without objection on his part, contained admissions and was relevant in establishing the case against him. The judge admonished the jury that the evidence was to be received solely as to Hernandez and that it should not be used in any way with reference to Bates or Chavez. Under the rule set forth above, it was not error to admit the conversation subject to the admonition of the court.

■ The April 9 conversation consisted of accusatory statements by Brenhaug in response to questions put to him by the police in the presence of the three defendants, together with defendants' reactions when asked what they had to say concerning Brenhaug's version of what occurred on April 4. In general, evidence of this type is not admissible where there was a denial by the defendant, but it may be received if the truth of the accusation was admitted or if, under circumstances calling for a denial, there was silence or equivocal or evasive answers indicating a consciousness of guilt or acquiescence in the truth of the statements. (*People* v. *Simmons,* 28 Cal.2d 699, 711 et seq. [172 P.2d 18] ; see *People* v. *Abbott,* 47 Cal.2d 362, 373 [303 P.2d 730] ; *People* v. *Davis,* 43 Cal.2d 661, 669-672 [276 P.2d 801].)

The conversation was properly admitted as to Hernandez, who made minor corrections with respect to Brenhaug's statements but said that they were substantially true. Chavez, on the other hand, denied everything and said that Brenhaug and Hernandez were lying. The prosecution offered to exclude the portions of the conversation which disclosed that Chavez was present during the questioning and that he had made statements in the nature of denials. Chavez objected to the introduction of the evidence but insisted that if any part of it was to be received it should all be admitted.

The trial court recognized that the conversation was not admissible as to Chavez, and admonished the jury that it was not to be considered in any way with regard to him, and we must assume that the jury followed the court's admonition.

With respect to Bates it is clear that part of the conversation was admissible in view of the fact that he said he remembered going to the Mecca with Brenhaug, Chavez and Hernandez, that they had a "beef" there, and that he was with Chavez and Hernandez at the Corner Café about closing time. As to the remainder of the conversation, he insisted that he did not remember, and while he did not expressly say so, it seems obvious that his position was that he was unable to remember because he was intoxicated. Under the circumstances his asserted failure to remember cannot properly be taken as an evasive or equivocal response indicating consciousness of guilt or acquiescence in the truth of Brenhaug's account, and it follows that the conversation was erroneously admitted as to Bates insofar as it related to the trip to the gasoline station, the return to the Mecca, and incriminating remarks made by him on the night of the fire.

We are satisfied, however, that the error does not require a reversal. (See Cal. Const., art. VI, § 4½.) At the trial Brenhaug took the stand and testified to substantially the same facts as were set forth in the conversation, and he was subjected to lengthy cross-examination. This testimony, together with other evidence, amply established the case against Bates, irrespective of the erroneously admitted conversation. Indeed, Bates' position at the trial was not based on a denial of what happened on the night of April 4 but on the claim that he did not remember and that he was so intoxicated as to be guiltless of the crimes charged, a claim which the jury rejected, as it was entitled to do under the evidence. Moreover, in receiving the conversation and, again, in giv-

ing formal instructions to the jury, the court made clear that, unless the conduct of Bates indicated an admission, the conversation should be entirely disregarded, and it is highly unlikely that Bates' response that he did not remember would have been viewed by the jury as an admission.

Defendants complain of the admission, over objection, of a number of photographs showing bodies of persons killed in the fire. Such photographs should be excluded where their principal effect would be to inflame the jurors against the defendant because of the horror of the crime; on the other hand, if they have a probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, they are admissible, and the resolution of this question is primarily for the trial court in the exercise of its discretion. (*People* v. *Carter*, 48 Cal.2d 737, 751 [312 P.2d 665]; *People* v. *Cheary*, 48 Cal.2d 301, 311-312 [309 P.2d 431].)

Two of the photographs, showing bodies inside the premises and the charred condition of the bar, were used in connection with the testimony of a fireman who was called as an arson expert. They were relevant in determining the point of origin of the fire and were corroborative of the expert's testimony. In our opinion the trial court did not abuse its discretion in concluding that the probative value of these photographs justified their reception in evidence.

The other photographs, which were taken of the bodies of all the victims after removal from the Mecca, were admitted on the theory that an autopsy surgeon testified as to the degree of burns on certain bodies and that the burns contributed to the deaths. Defendants, however, offered to stipulate to the cause of death and identification of the victims, and, moreover, it was with respect to only one victim that the medical testimony showed that the death was caused in part by burns. The trial court abused its discretion in overruling the objections to these photographs, but, in view of the entire record, including the testimony as to the burned condition of several bodies, the error did not result in a miscarriage of justice. (See Cal. Const., art. VI, § 4½.)

Defendants point to the prosecution's argument to the jury in support of their claims of prejudicial misconduct. In commenting on testimony to the effect that one of the People's witnesses had stated she hoped the guilty persons would get the gas chamber, the prosecutor said, "I wish I had a dollar for every person in this community that did not know

anyone that died there, did not even know where the place was; that when they saw it in the paper, made the same utterance that those who did it should die." Defendants' request that the prosecuting attorney be cited for misconduct in making the statement was properly refused by the trial judge, who pointed out that the remarks were not evidence "but purely a matter of argument."

 With reference to the cross-examination of Brenhaug as to whether he or his attorney had made "a deal," the prosecutor said, "A deal with the District Attorney's Office? I know of no such deal. It's my case; and accept my word, there was no deal with Mr. Brenhaug." No objection was made to this portion of the argument. Even though the statement of the prosecuting attorney was improper, we must assume that the court would have admonished the jury if an objection had been made.

 Defendants also complain that the jury was misled by what occurred when counsel for Chavez, during his argument to the jury, suggested the possibility of verdicts of second degree murder or manslaughter. The prosecutor objected, saying that the court "has disposed of that matter as a matter of law, and has indicated that the facts of this case constitute arson within the meaning of 448a of the Penal Code." The court stated it would so instruct the jury and directed the attorney for Chavez not to "discuss any other possibilities." Later in the discussion Chavez' counsel said that "448a does not say that this is a crime of arson." The court then made the following statement: "The Court has told you that the Court does find that it is arson, and you are not to argue that law to the jury. The Court will instruct the jury as to the law. You are not to attempt to argue that law to the jury." Counsel then said that he felt he was "entitled to discuss that law with them and the application to this case," and the court replied, "Well, you may do that, but as to whether or not it is arson within the purview, the Court has already expressed it, that under 448a, the Court finds that that is arson." Counsel; instead of making any objection to the court's remarks, said, "I'll take it from there, then." If there had been an objection the court would undoubtedly have made it perfectly clear that it did not intend to withdraw the factual question of guilt from the jury but was merely referring to a matter of law which would be covered in its instructions, i. e., that the offenses specified in section 448a constitute arson, as the term is used in section 189 of the Penal Code.

Other contentions made by defendants are wholly without merit and need not be discussed.

The judgments and orders denying a new trial are affirmed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

The petitions of appellants Manuel Joe Chavez, Clyde Bates and Manuel Hernandez for a rehearing were denied October 15, 1958.