Ernest W. HARRIED, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20372.

United States Court of Appeals
District of Columbia Circuit.

Argued Aug. 2, 1967.

Decided Nov. 30, 1967.

Mr. Sidney Dickstein, Washington, D. C. (appointed by this court), for appellant.

Mr. Scott R. Schoenfeld, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Allan M. Palmer, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and BURGER and WRIGHT, Circuit Judges.

BURGER, Circuit Judge:

Appellant was convicted of murder in the first degree and sentenced to life imprisonment upon the recommendation of the jury. Appellant filed a *pro se* motion in this Court for mandamus or habeas corpus which was treated as a timely motion for an appeal in forma pauperis and granted by the District Court.

The record reveals that at about 12:30 p. m. on June 10, 1965, the body of a six-year-old boy was discovered in a blue denim bag, bound with ropes and gagged with adhesive tape. Almost simultaneously, Lillian Catlett, accompanied by Appellant who was a friend, went to the boy's school to learn why her son Zachary had not returned for lunch. Appellant called the Missing Persons Bureau when the boy was not found at school and later accompanied the boy's mother to the police station. At trial Mrs. Catlett testified that the police did not ask Appellant to come to the station but he accompanied her to comfort her as a friend.

The record is unclear as to Appellant's movements thereafter. At some point the police asked him to indicate the route of the boy's trip to school and with police he went to the scene to identify the boy's body. On the way to the scene, an officer said to Appellant, "you know the boy's dead, don't you?" Appellant said "no."

After identifying the body as that of Zachary Catlett, Appellant asked where the boy's shoes were. He told the police that the boy had worn brown shoes and identified the shoes which the police showed him as the same brand that he had seen on a shoe box in the boy's house. All this occurred before 1:25, when the body was removed. Appellant stated that he did not believe he was "officially" under arrest at this time.

Appellant was apparently taken to the Homicide Squad room after the identification of the victim's body and there questioned. At some point before his arrest at 5:53 p. m., Appellant was identified by a witness as the man who had been seen carrying a full blue bag over his shoulder from his house that morning. At some point that afternoon not fixed in the record, Appellant stated both to the police and to the boy's mother that he had killed the boy, but this confession was not introduced.

Meanwhile, at 3:45 p. m. on the same afternoon, police officers investigating the case went to the rooming house in which Appellant lived. When there was no response to their knock on the front door they proceeded to the back door by way of the side yard, where they observed an empty adhesive tape dispenser. They also observed, through a rear door which was ajar, some crushed cookies, a metal hook and what appeared to be blood stains on pieces of cardboard. The officers then returned to police headquarters where they applied for a search warrant for Appellant's quarters on the basis of this information and recitals that the tape dispenser held the same size tape as that with which the boy was gagged, that the metal hook was similar to the one with which the boy's legs were fastened, and that the boy was known to have been carrying cookies to school.

The search warrant was issued at 5:25 p. m. It covered the "entire premises" and authorized the seizure of "a Johnson and Johnson two inch adhesive tape container; cookies, a metal hook, and cardboard appearing to be bloodstained and any other instrumentalities of the crime" of murder of Zachary Catlett. Pursuant to this warrant, several items in addition to those specifically listed were seized: two pairs of scissors, strips of adhesive tape, a sheet from Appellant's bed, a skid chain, two butcher knives, a pair of shorts and a shirt. Of those objects not itemized, only the strips of tape, scissors and bedsheet were introduced, without objection, into evidence.

Following indictment and arraignment, defense counsel's motion that Appellant be committed to St. Elizabeths Hospital for mental observation was granted. Appellant was found competent to stand trial. Subsequently, a motion by Appellant for a mental examination by the Legal Psychiatric Division of the Department of Health for the District of Columbia was granted. The resulting psychiatric report stated that Appellant was competent to stand trial, but that he had been suffering from a mental illness and that his criminal act was a product of this condition.

At trial, photographs of the dead body and black and white photographs of the grease covered cardboard pieces that contained some blood spots were introduced by the Government, without objection.

Before offering any evidence defense counsel informed the judge that he desired to raise the claim of insanity but that Appellant objected to this course. After conferences with the prosecutor and the defense attorney, and a recess, the District Judge decided to exercise his discretion to raise the criminal responsibility issue notwithstanding Appellant's objection. The judge noted that one psychiatrist had reported that Appellant was suffering from a mental disease at the time of the crime.

The defense introduced testimony by the psychiatrist who had reported that Appellant had a mental disease. Without objection he testified to having examined Appellant in connection with another child assault case in 1962 and again in connection with this case and concluding that Appellant was schizophrenic. He further testified, after defense counsel assured the Court that he

wanted this evidence in, to an assault on the child of a woman with whom (as with Lillian Catlett) Appellant was romantically involved. The defense also called an uncle of Appellant's who testified to attacks on women and children by Appellant.

At the conclusion of the case, the Government proposed a charge to the effect that a verdict of not guilty by reason of insanity would permit the Appellant to go free unless the Government instituted civil commitment proceedings. Defense counsel objected to this charge, but offered no alternative, and no charge was given on this question.

Appellant raises three challenges to his conviction: (1) that it was error for the trial court not to direct, *sua sponte*, a bifurcated trial once the court had injected the issue of insanity into the case; (2) that Appellant was not informed of his right to have two attorneys appointed to represent him in a capital case; and (3) that he was denied effective assistance of counsel.

### (1)

█ █ The trial judge has discretion to grant a bifurcated trial on the issue of criminal responsibility, Holmes v. United States, 124 U.S.App.D.C. 152, 363 F.2d 281 (1966), but it is not his duty to consider the question of bifurcation absent a request from defense counsel. Here no request was made. Appellant contends, however, that the trial judge should have considered the matter *sua sponte*, because it was at the trial court's instance that the issue of insanity was injected over the objection of the Appellant.[1] See Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388 (1961), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). But the Court's determination that insanity should be raised in no way interfered with trial counsel's power to request a bifurcated trial. In fact, the decision was made only after several conferences with Appellant's attorney.

The asserted right to a bifurcated trial suffers from another defect. Here, as Appellant's brief states, he "staked all on the insanity defense." He took the stand to deny his guilt but his testimony substantially corroborated that of the Government's witnesses. Indeed it was in part the lack of any real defense on the merits that influenced the trial judge to exercise his discretion to interpose the insanity issue. It is clearly not the import of *Holmes* to require a bifurcated trial in every case where there is a substantial insanity question. If it were, this Court would not have left it to the "broad discretion" of the trial judge to weigh the factors of substantiality of the claim and possible prejudice to the defense on the merits to determine if bifurcation is appropriate.

█ Where there is no "defense" beyond putting the Government to its proof, we fail to see how there can be prejudice to the defense on the merits due to failure to bifurcate.

### (2)

█ █ Appellant asserts error in the failure of the United States Commissioner or the Court to advise him of his right to have two attorneys appointed to represent him in a capital case. 18 U.S.C. § 3005 (1964). But Appellant was represented from the preliminary hearing on by a retained attorney. Since the rights under § 3005 relate to *appointed* counsel, they are inapplicable to the present case. See United States v. Morris, 178 F.Supp. 694 (E.D.Pa.1959), aff'd, 277 F.2d 927 (3d Cir.), cert. denied, 364 U.S. 848, 81 S.Ct. 91, 5 L.Ed.2d 72 (1960).

### (3)

█ The burden on the Appellant to establish his claim of ineffective assistance of counsel is heavy. See Bruce v. United States, D.C.Cir., 379 F.2d 113 (1967); Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787, cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.

---

1. There is no claim that this ruling was improper.

2d 86 (1958). The question here is whether his representation was so ineffective that Appellant was denied a fair trial. We conclude that he was not denied this right. On the contrary, the record reveals a careful defense, built upon the claim of insanity once it was raised by the court.

In assessing a claim of ineffective assistance of counsel, we look to the entire record. Defense counsel was confronted with a strong case presented by the Government and he understandably concentrated on the claim of insanity. Appellant insisted on testifying, apparently against the advice of his counsel. When defense counsel disclosed his dilemma to the trial judge at a bench conference, a recess was granted to allow counsel to confer with Appellant.[2] On taking the stand Appellant proceeded to confirm much of the Government's factual and circumstantial evidence against him; he denied that the deceased ever came into his house or that he murdered him. The defense presented a qualified psychiatrist who testified that Appellant was suffering from a mental disease which had "produced" the criminal act.[3] Appellant's uncle testified that prior assaults on children and others had been committed by the Appellant when in a state such that he could not be reasoned with and could not remember his actions afterwards.

Appellant's brief concedes that the trial counsel "staked all on the insanity defense," and makes no claim that this defense was not adequately pursued or that there were other avenues of defense that should have been followed. Instead, as will be apparent, the attack is upon decisions of trial strategy and tactics.

Appellant contends that he was denied the effective assistance of counsel because of three failures of his trial attorney: (1) the failure to move to suppress evidence obtained by the Government pursuant to a search warrant; (2) the failure to object to the introduction of photographs of the body and other al-

2. Trial counsel told the Court: "he insists on going on the stand so what can I do? I do not know." After the recess, trial counsel reported that "I have taken up this matter with my client and he feels that he would like to go on the stand and explain his part of the matter." Tr. 286, 288.

3. When the defense attorney had completed his examination of the psychiatrist, the trial judge stated:

I think it may be inferred from what has been said by this doctor, that in his opinion what was done in this instance, if it was done, was consistent with the disease which he found and, hence, the act was the product of that disease, but I think you might, with propriety, give him the opportunity to directly state that if it be true.

Defense counsel then recalled the psychiatrist and asked him, "is it your opinion that the act committed or alleged to have been committed by the defendant at this time is a product of this mental disease?" The expert answered, "I do believe that, sir."

There can be no doubt that the question was a violation of United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935), but we have long tolerated violation of that rule. It was addressed to a conclusion—a legal conclusion—in an area beyond the competence of the psychiatrist as an expert witness as limited by *Spaulding* and was phrased in the precise legal terms of the ultimate question which would be given to the jury. See Green v. United States, 127 U.S.App.D.C. 272, 274; 383 F.2d 199, 201 n. 3 (1967). There is no error here as there was no objection and this testimony supported the claim of insanity but was not accepted by the jury.

The correct form of question for counsel to put is to ask the expert to assume, but only for purposes of the case, that the accused did in fact commit the act charged and then inquire if the expert has an opinion based on reasonable medical certainty whether there is any causal relationship between the assumed act and the mental abnormality he has described. The question should caution the expert to state his opinion, if he has one, in terms of relationship, not in terms of "product." The expert should then explain why and how the abnormal mental condition directly influenced the commission of the act if such is the case or how the abnormality impaired the defendant's capacity to control his behavior in relation to that act or both, if the expert is prepared to so state.

legedly prejudicial evidence; and (3) the failure to request a modified *Lyles*-type instruction that Appellant would be committed to a hospital as a result of a verdict of not guilty by reason of insanity.

■■■ Appellant asserts that it was ineffective assistance for trial counsel to fail to suppress certain evidence seized under a search warrant. Appellant now contends that the search warrant was the "fruit" of a prior, unconstitutional search. The challenged search was that set out in the affidavit supporting the request for a search warrant. The facts recited in the affidavit do not describe a "search" at all; they are quite consistent with permissible, indeed commendable, alert observations in the course of an investigation into a murder.

Appellant argues that the facts recited in the search warrant application should have led trial counsel to move to suppress the evidence seized. Trial counsel knew well in advance of trial about the search warrant and was given full access to the Government's files. We reject the notion that it is defense counsel's duty to "make every motion in the book" in the hope that one may succeed. On this record there was no compelling reason to move for suppression.

■■■ Appellant also contends that a motion should have been made to suppress the evidence as the fruit of an illegal confession. We find no merit in this contention; again, the claim of error rests on imaginative speculation rather than facts in the record. That Appellant did in fact confess is indicated on the record, but that confession was not introduced at trial. It is mere conjecture that there was a violation of defendant's rights in obtaining the confession.[4] It is also mere conjecture that the confession even preceded in time the issuance of the warrant, much less that it was the *reason* for the issuance of the warrant. The affidavit in support of the request for the warrant recites sufficient cause for the warrant and makes no references to any statement of Appellant. From its inception, the "fruit of the poisonous tree" doctrine has not applied where the information was also obtained from an "independent" source. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). See Costello v. United States, 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

■■■ Appellant also contends that even if the search warrant was legally obtained, defense counsel should have moved to suppress the items seized because they were not "instrumentalities" of the crime. See Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The items in question were, among others, the metal hook and piece of tape similar to those used to bind and gag deceased; scissors that were connected only in that stab wounds in the boy were made by a sharp object consistent with use of such scissors; the tape container that held tape of the same size as that used to gag the deceased and on which Appellant's fingerprints were found; the pieces of cardboard which contained spots of blood of the same group as the deceased's. We hold that seizure of these items as instrumentalities of the crime was permissible under this warrant and the failure to move their exclusion was not ineffective assistance of counsel. On this record such motion could not have been granted.

■■■ Appellant also contends that the failure to object to the admission of

---

4. Appellant has sought to demonstrate, by reliance on the Appellant's remarks at the scene that the boy's shoes were gone and the question of his knowledge that the boy was dead put to him while en route to the scene, that the police investigation had by then "focused" on Appellant. See Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). There is nothing on this record to show whether or not Appellant was informed before any interrogation of his rights to counsel and to remain silent. Appellant argues, however, that the prosecution must have concluded that the confession was illegally obtained because it was not introduced at trial. This is a *non sequitur*.

certain photographs demonstrates ineffective assistance of counsel. We disagree. The photographs are those of the body as found by the police. The photographs in question here evidenced the mode of death by strangulation and stab wounds in the neck. Photographs of the body are admissible so long as they have some probative value and are not intended solely to inflame the jury. There was no abuse of discretion in admitting this evidence. See Rivers v. United States, 270 F.2d 435 (9th Cir. 1959), cert. denied, 362 U.S. 920, 80 S.Ct. 674, 4 L.Ed.2d 740 (1960); People v. Chavez, 50 Cal.2d 778, 329 P.2d 907 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 356, 3 L. Ed.2d 353 (1959).

Appellant's final point on the ineffectiveness of counsel below is that he failed to request an instruction on the effect of a verdict of not guilty by reason of insanity. In Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), this Court held that, on request, the District Judge should tell the jury the operation of the mandatory commitment provisions of 24 D.C.Code § 301(d) (1967).

In this case, Appellant individually recorded his objection to raising the question of insanity. Since Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962), he therefore could not be automatically committed after a verdict of not guilty by reason of insanity and *Lyles* does not apply; indeed the *Lyles* charge would have been an incorrect statement of the law. The Government proposed an alternative charge that the defendant would be released unless the Government brought civil commitment proceedings after a verdict of not guilty by reason of insanity, but defense counsel objected to this charge, and the court indicated that it felt the objection was sound.[5]

On appeal it is argued that counsel should have proposed an alternative charge, stating that the Government *would* have defendant civilly committed if the verdict were not guilty by reason of insanity. This would require the trial judge to charge the jury on what the Government's future course would be and obviously the court could not predict, any more than it could direct, the Government's action.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (concurring in the result):

I concur in the result. Appellant's attacks on his retained trial counsel for ineffective assistance, while serious, are not sufficiently supported by the record as made to warrant reversal.