**UNITED STATES of America, Appellee,**

v.

**Ellis Mack WILSON, Appellant.**

**No. 10991.**

United States Court of Appeals Fourth Circuit.

Argued Feb. 9, 1967.

Decided June 19, 1968.

F. Lee Cogdill, Newport News, Va. (Court-appointed counsel), (Palmer & Cogdill, Newport News, Va., on the brief), for appellant.

C. V. Spratley, Jr., U. S. Atty. (Roger T. Williams, Asst. U. S. Atty., on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

HAYNSWORTH, Chief Judge:

The defendant appeals from a conviction of bank robbery, contending there should have been a directed verdict of not guilty by reason of insanity. The contention is insubstantial, and the conviction is affirmed.

Immediately prior to the robbery of the bank, Wilson spent four days in jail on a charge of public drunkenness.[1] During those four days, he seemed to his jailers "queer." A "model prisoner," he was sometimes normally responsive conversationally, but at other times appeared not to understand what was being said to him. One of the jailers related the unresponsive interludes to periods of despondency, and each of

---

1. From the pre-sentence report, read and discussed at the allocution, this was not a novel experience for him. The list of convictions for drunkenness and disorder-ly conduct, and two or three convictions for such offenses as theft of government checks, filled eight pages.

them sympathetically confirmed the fact of a seizure, which was assumed to be epileptic and for which he was given anticonvulsive medication.

On leaving the jail, without having had any alcohol for four days, Wilson went to a bank, passed a prepared note to a teller, received the money, threatened to kill the teller if an alarm was sounded before Wilson left the bank, turned midway toward the door and again at the door to repeat and emphasize the threat, and fled with the money. He took a taxi and asked the driver to take him to a department store where he might buy clothing. The driver attended him in that project and, after purchase of the clothing, drove Wilson to a whiskey store where, inferentially, Wilson purchased a bottle of whiskey. Wilson then asked to be taken to a hotel where he could get a hair cut and a place to sleep.

He was arrested while in the barbershop.

At the trial, it was sought to be shown from the seizure in the jail and from the defendant's unconfirmed report of a subsequent seizure while under observation at St. Elizabeth's that he was an epileptic and criminally irresponsible. The defense was exploded when the psychiatrist offered in its support testified that (1) he did not think the defendant's seizure was epileptic, (2) that confusion after an epileptic seizure—a *grand mal*—lasts for only fifteen or twenty minutes, and (3) with the anticonvulsive medication Wilson had received in jail, an epileptic would be unexposed to seizures and completely normal mentally and emotionally.

On cross-examination and subsequent re-direct examination of the psychiatrist, it was brought out that Wilson's controls are impaired. While the psychiatrist testified that he thought that Wilson, while under observation at St. Elizabeth's, was a malingerer, exagger-

ating his epileptic symptoms, giving the wrong answers to all of the trick questions and being so uncooperative that they could not obtain a reliable I.Q. grade, the witness concluded that Wilson suffered from a sociopathic personality disorder.

With no reference to his history, except for the fact that his mother had died in a mental institution, there was very little violence in his history and that he was forty-six years old and divorced, the doctor expressed a number of conclusions.

Wilson is a chronic alcoholic. There is some evidence of organicity, brain changes resulting from prolonged alcoholic excesses, but that was minor and could not explain any departure in his conduct from normalcy.

The psychiatrist described Wilson as irresponsible, self-centered, egocentric and infantile. He never attained emotional maturity nor had he acquired in any significant degree those moral inhibitions which govern the conduct of normal adults. Without such inhibitions and with his preoccupation with his own needs and wants untempered by any concern for the rights of others, Wilson would do anything he wished if he thought it would serve his purposes. Wilson, the psychiatrist thought, fully understood the difference between right and wrong, but his abstract understanding was not a great restraint because of the absence of normal moral inhibitions. Though the psychiatrist noted that there was little or no violence in Wilson's history,[2] the witness thought Wilson would do anything if he wished to strongly enough and thought he could get by with it.

Wilson has no psychosis of any kind, but without normally developed moral inhibitions, he has no effective inner controls over his conduct. To that extent, he has an impaired capacity to conform his conduct to standards generally observed by normal adults. The witness

**2.** A fact confirmed by the record of convictions considered at the allocution.

Stealth, stealing checks seems to have been in character, but not bank robbery.

harked back to an old term "moral insanity" to describe Wilson's marked character defect exemplified by his primitive conscience. Wilson is so immature emotionally and morally, the witness said, as to be a caricature of a responsible adult.

The doctor felt that Wilson's prognosis was extremely poor. No treatment with any hope of improvement was indicated, but the witness was of the opinion that, at large, Wilson would inevitably be in trouble with the law.

■ We may pause here to note the basic factual sparsity of the record. After the peg of epilepsy, upon which the defense sought to hang its hat, was brushed aside, the expert witness was allowed and encouraged to state his conclusionary appraisal of the defendant. Conclusionary answers were given to questions which called for them and which, most frequently, were attempted to be cast in terms of ultimate inferences. "Does the defendant know the difference between right and wrong?" "Has he the capacity to refrain from doing what he wants to do if he wants very much to do it?" These are summary paraphrases of a barrage of questions that ultimately elicited in considerable detail the psychiatrist's summary description of the defendant. No one, however, asked the witness about the bases of his judgment. The government may be under some restraint in probing those bases too deeply when they include a long record of prior convictions, but the defense is not. It may be strategic for the defense to avoid bringing out information about a criminal record which indicates a propensity to commit the kind of offense with which the defendant is charged, but looking at the presentence report, that was not the case here. The deficiencies of the record here seemingly result from an elementary preference for the unexamined conclusions of the expert witness over their factual predicates. It was only by happenstance that the witness testified that there was very little violence in Wilson's history, and the paucity of other basic information is proclaimed by the fact that we know nothing else about him except that he was forty-six years old, white and divorced. The doctor testified that Wilson had been a failure in everything he ever attempted, but the jury and we know nothing of anything Wilson ever attempted except marriage, and that is entirely unelucidated.[3]

Had this trial occurred after our decision in *Chandler*, we would have been inclined to remand the case for a retrial on the issue of mental responsibility because of the failure to develop the factual bases of the psychiatrist's opinions. The trial was at an earlier date, however, and we do not think the District Judge can be faulted for not having injected himself into the case more extensively than he did. Nor can we find any absence of fundamental fairness in the trial. The psychiatrist's description was full, complete and extensive, though the factual bases for his description and his judgments are lacking. His emphatic statement of his conclusionary views may have been far more effective from the defendant's standpoint than they would have been if he had been called upon to justify them. At any rate, he undertook to describe the man and was in no sense limited to answers to the ultimate questions to be submitted to the jury.

Under these circumstances, we think it unnecessary, on our own initiative, to remand the case for a partial retrial.

■ On this appeal, it is contended only that the defendant was entitled to a directed verdict of acquittal by reason of insanity. The contention is without foundation. The jury was not bound to

3. See Washington v. United States, D.C. Cir., 390 F.2d 444; United States v. Chandler, 4 Cir., 393 F.2d 920. We imply no criticism of defense counsel, however. It may not have seemed in the defendant's interest to bring out all that we find deficient in the record. That is one of the problems of our present procedure.

accept the conclusionary appraisal of the expert witness, but, even if it did, there is nothing in the law which requires a jury to acquit the kind of sociopath the doctor thought the defendant to be. As a standard for criminal responsibility, we have approved and adopted the American Law Institute's formulation.[4] Its references to powers of control, as emphasized by the caveat, do not encompass those who do not wish to control and restrain their conduct as contrasted with those whose controls are not governed by their wishes. As long as an individual has a substantial capacity for choice, he does not escape the law's criminal sanctions because he chooses imprudently or so prefers his immediate self-interests that he is prepared to commit deliberate transgressions whenever he thinks they will advantage him and that he will not be caught.

■ This is not to say that Wilson's claim of innocence by reason of insanity was not appropriate for consideration by the jury. There is enough doubt about a sociopath such as he to call for an exercise of the jury's moral judgment, but the jury is not required to accept the most favorable implications of the most favorable answers of lay and expert witnesses without regard to qualifying and explanatory testimony. Nor are unqualified and unexplained conclusions of a witness binding upon a jury when their factual bases are not probed or explained. The psychiatrist here never expressed the opinion that Wilson had no substantial capacity to control his conduct in the context of a bank robbery, but, if he had, the opinion would not bind the jury in the absence of a proven factual predicate which would admit of no other conclusion. The question was clearly one for the jury, and the motion for a judgment of acquittal, which would have deprived the jury of its function, was properly denied.

This disposes of the defendant's contentions. He has raised no question about the court's instructions, though we notice them in light of our recent adoption of the American Law Institute's formulation.

■ In charging the jury on the question of mental responsibility, the court used a liberalized version of the charge approved by the Supreme Court in the *Davis* cases.[5] The jury was told, in pertinent part, that even though Wilson knew the difference between right and wrong and knew that the act he was committing was wrong he should be acquitted if "his will, that is to say, the governing power of his mind, has been so impaired that his actions are not subject to it but are beyond his control."

The instruction is reminiscent of Hadfield's Case, 27 State Trials 1281 (1800) which we discussed in *Chandler*. It differs from the American Law Institute formulation but slightly. There is no direct reference to substantiality of capacity to control his conduct, but it suggested to the jury that if the act was beyond Wilson's impaired capacity, they should acquit. The American Law Institute rule does no more. Importantly, the instruction does not imply that the jury must find a general destruction of the defendant's will, as *Davis* does; impairment is enough if the act is beyond the reach of the diminished capacity to control.

If the instruction as given is not the equivalent of the American Law Institute rule, the difference is so slight that a retrial is not required. This is particularly so in light of the fact that defense counsel affirmatively approved the charge as given and has not questioned it here.

Affirmed.

---

4. United States v. Chandler, 4 Cir., 393 F. 2d 920

5. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750.

SOBELOFF, Circuit Judge (dissenting):

This case is troublesome because, as the court's opinion notes, there was no error in the District Court's rulings or in its instructions to the jury. Yet the entire trial below was not directed to the essential point, and the majority's disposition, I fear, compounds the difficulty.

Appellant's basic defense at trial was insanity. His psychiatric witness—the only expert witness—testified that appellant had a character or personality disorder which was so severe as to constitute a mental illness. Appellant was termed "a caricature of an adult." According to the psychiatrist, Wilson has "an aborted kind of mind" and he "emotionally functions like a five year old." More, he is said to lack "a mature capacity to adhere to the right," and his capacity for exercising mature judgment is labelled "seriously impaired." Most importantly, as the majority observes, "he has no effective inner control over his conduct." Upon this unchallenged foundation, not shaken but actually developed on cross-examination, it is difficult to erect or sustain a finding of sanity beyond a reasonable doubt.

Although there was no contradictory expert testimony, the jury found appellant guilty. Like the majority, I can only speculate as to why the jury ignored the psychiatrist's testimony. Like the majority, I am inclined to the view that the primary reason was that the psychiatrist's conclusions, though clearly enunciated, were not buttressed by any substantial information about appellant. The psychiatrist testified only that appellant's "whole life is just one picture of irresponsibility, dependency, laxity, drinking, indulging himself in whatever he wants to do, rather than assuming any kind of responsibility. Whatever he's done, wherever he's been, he's been a failure." The defect in the proceedings is that the facts from which this picture of appellant was constructed were never presented to the jury.

A psychiatrist has the obligation to present the jury with the underlying data upon which his opinion is predicated.[1] Unsupported conclusions do not give the jury an enlightening view of the defendant's condition. The jury should be afforded a full opportunity to focus on the dynamics of defendant's mental and emotional processes and on his capacity to control his actions, rather than to be forced to wrestle with esoteric psychiatric terminology.

To a large extent, however, the character of a psychiatrist's testimony will depend on the nature and direction of the examination by counsel. Here the examination was extremely cursory and uncritical. Most of defense counsel's questions to the psychiatrist dealt with appellant's alleged epilepsy. But the psychiatrist, appellant's own witness, testified that he was uncertain whether appellant suffered from epilepsy and that in any event, epilepsy would not affect appellant's capacity for control except during the actual seizure. It was only on *cross-examination* by government counsel that appellant's infantile emotional processes were brought to the attention of the jury.

Quite apparently, defense counsel and his psychiatrist had not engaged in significant consultation prior to trial. Another possible explanation for the nature of the direct examination is that suggested by the majority, namely, that defense counsel may have deliberately wished to suppress certain facts about appellant's background. In some insanity cases the problem may arise that the same facts which tend to demonstrate defendant's mental illness are also likely to convince the jury that he committed the offense charged. Usually the defense of insanity is by way of confession and avoidance—confessing the act and

1. See United States v. Chandler, 393 F.2d 920 (4th Cir. 1968). See also Washington v. United States, 390 F.2d 444 (D.C. Cir. 1967), and especially the court's recommended instruction to expert witnesses.

seeking to avoid punishment because of legal irresponsibility. But where there is an independent defense in addition to insanity, or the prosecution's proof of the commission of the act is weak, the defense counsel and the trial judge should consider a bifurcated trial, so that the questions of whether defendant did the act and, if so, whether he was criminally responsible can be tried separately.[2] Since at the outset, only defense counsel is likely to be aware of the relevant facts relating to the merits of the defense or the claim of insanity, he has primary responsibility for suggesting the desirability of bifurcation. But there may be cases when the trial judge himself should perceive the appropriateness of bifurcation and should on his own initiative suggest this procedure to counsel. In any event, in the instant case there seemed to be no doubt that appellant committed the robbery. Thus defense counsel should not have been reluctant to reveal significant facts in appellant's past, even without a bifurcated trial.

When psychiatrist and counsel fail to provide sufficient underlying information to the jury, the judge, I maintain, has some responsibility to help elicit this vital information. Although ours is indeed an adversary system, a criminal trial is not a game. It is a solemn proceeding in which moral judgment is pronounced. As the governor of the trial, and not a mere moderator, the judge has an affirmative duty to do all that is feasible to assure that these judgments are based upon all the relevant evidence. The judge should not hesitate to prevent the distortion of the jury's perspective by counsel's deficient exploration of the underlying, determinative facts. In some cases, the court may feel obligated to suggest that additional witnesses be called. At the very least it should en-sure that the psychiatrists who do testify describe the investigations, observations, reasoning and medical theory which led to the ultimate opinion, as voiced on the witness stand.

Professor McCormick has declared that the "core" of the opinion evidence rule would be preserved by a rule "prescribing that the trial judge in his discretion may require that a witness before giving testimony in terms of inference on general description shall first give the concrete details upon which the inference or description is founded, so far as feasible."[3] The need for judicial supervision is particularly urgent in insanity cases, where the adversary system may malfunction because of the inexperience of counsel, the complexity of the issue, or both. Most criminal defendants are represented by court-appointed lawyers with little experience in criminal law or even other areas of trial work. These lawyers must master new fields of law and new skills. When, in addition, it becomes their task to present a defense of insanity, which involves elusive medical, legal and moral problems, they are often understandably overwhelmed. In these circumstances, intervention from the bench may be absolutely essential for a fair trial.

In the instant case, the trial judge did play more than a passive role. On several occasions he commendably required the expert witness to clarify his opinions. But he never demanded that the psychiatrist present the factual basis for his opinions. Thus the jury never obtained a complete unfolding of defendant's emotional and mental processes. If they had, they might have acquitted by reason of insanity.

I recognize that for many years the insanity defense has been presented in this unsatisfactory manner. But it is no consolation to appellant to tell him that this is the way things have always

---

2. See Holmes v. United States, 124 U.S. App.D.C. 152, 363 F.2d 281 (1966); Harried v. United States, 128 U.S.App. D.C. 330, 389 F.2d 281 (1967).

3. McCormick, Evidence 24 (1954) (citing Uniform Rules of Evidence Rule 57).

been done, and the inertia of established practice should not prevail over the demands of justice. The fact remains that he did not have a sufficient hearing on the issue of insanity. I would remand to afford an opportunity for such a hearing. Retrial could be limited to the insanity issue, since there was no taint in the jury's finding that appellant committed the acts charged.[4]

After years of intense search by the profession for an improved standard of criminal responsibility, our circuit and others have achieved a virtual consensus. I ask, however, what has been gained for the judicial system by all this effort if, in the trial of cases involving the defense of insanity, the same old questions continue to be asked and the same conclusional answers are accepted. Have we advanced materially if we tolerate the complete failure of either side to focus on the basic facts indispensable for any significant judgment under the new, carefully established standard? If as shallow and mechanical a performance as this record discloses is validated, then the years of earnest debate upon the legal formula will have advanced us not an iota. I do not overlook the fact that this case was tried before the decision in *Chandler*, and this may in part account for the inattention to the depth of the requisite inquiry.

We can, of course, say that the case has been insufficiently proved and therefore affirm, but it is preferable by far for us to remand for a genuine trial of the issue—especially as the defendant was represented by court-appointed counsel. Giving recognition to the objective of a trial when an insanity defense is interposed, it seems to me that, without visiting censure upon any of the participants in the instant case, this court should exercise its discretion to order a new trial and an appropriate investigation of the pertinent facts. By doing this we would give meaning and effect to the rule we recently adopted in *Chandler* and point the way to its effective implementation. Otherwise we sanction and encourage perfunctory performance and nullify the good doctrine of that case.

While I regret that the majority does not favor a remand in this instance, I note with satisfaction, and call to the attention of district judges in their future practice, the majority's statement that "had the trial occurred after our decision in *Chandler*, we would have been inclined to remand the case for a retrial on the issue of mental responsibility because of the failure to develop the factual bases of the psychiatrist's opinion."

Finally, I think that until we have a more adequate record it is inappropriate to discuss, as the majority does, whether appellant was the "kind of sociopath" covered by the American Law Institute's test for insanity. And it is equally inappropriate to determine that the American Law Institute's reference to powers of control "does not encompass those who do not wish to control and restrain their conduct as contrasted with those whose controls are not governed by their wishes." It may be that a person's lack of desire to control his conduct is itself the result of an exonerating mental disease or defect. Before passing on this point it would be helpful to have factual detail in the place of abstract theorizing.

---

4. See 28 U.S.C. § 2106; permitting an appellate court to "remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." See also Holmes v. United States, supra note 2.