STATE OF CONNECTICUT *v.* IMOGENE CLARK

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE NO. CR 14-66038

Argued March 24—decided May 29, 1969

*Brian L. Hollander,* of Hartford, for the appellant (defendant).

*Edward R. Smoragiewicz,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J. The information charged the defendant with the crime of cruelty to persons in violation of § 53-20 of the General Statutes. The jury having returned a verdict of guilty, judgment was rendered on the verdict.

We shall first consider the denial of the motion to set aside the verdict as against the law and the evidence. "The only question which can be raised by such a motion is the legal sufficiency of the evidence to support the verdict." *King* v. *Travelers Ins. Co.,* 123 Conn. 1, 3. The defendant has filed the evidence to support the assignment. Practice Book § 960.

The jury could reasonably have found from the evidence the following facts: The defendant and

her husband lived together as husband and wife at 26 Kensington Street, in the city of Hartford. She was the mother of a child who was nineteen months old at the time of the trial. On June 8, 1966, she gave birth prematurely to twin girls, named Karen and Sharon. The twins remained in the hospital for "about a month," at which time they were discharged and entrusted to the care of the defendant. On October 27, 1966, Karen was pronounced dead on arrival at Mt. Sinai Hospital. An autopsy was performed at the request of the coroner. It disclosed that the baby died from a combination of factors: severe malnutrition, severe dehydration, fecal impaction of the intestine and interstitial pneumonia. The child had been in grave condition for at least a few days, but the defendant failed to supply her with any medical aid or treatment, though aware that the case was of great gravity. On the same date, Sharon, very acutely ill, was admitted to Mt. Sinai Hospital. The medical evidence was that the baby suffered from severe malnutrition, dehydration, vomiting, and distention of the abdomen; she had developed constipation which was said to be of long duration. It was shown that Sharon gained five to six ounces within a matter of a few days after she was hospitalized. Her life was saved by the efforts of the doctors at Mt. Sinai Hospital. The defendant was not at any time a "working mother"; she remained at home with her children during this entire period. She testified that she had no difficulty in "buying enough food for the babies or preparing [their] formula." Moreover, she had access to a telephone in case she wished to summon a doctor, or call the hospital, or reach the Visiting Nurse Association. She failed to avail herself of any of these services. There was evidence in the record that she "broke an appointment on September 23, 1966, to have the twins weighed and have their first immuni-

zation at the Parker Street Center." Three doctors testified. We express no opinion as to whether their testimony was overborne by other testimony in the case. That was the function of the triers of fact. With the care and custody of the infants in her hands, with the power to change the situation, and with the duty of knowing that it ought to have been changed, she suffered it to go on. The offense in a case such as this does not necessarily consist of a single act or omission. From its nature, it is made up of a continuity of acts or omissions, none of which may be enough by itself, but each of which comes in with all the rest to constitute the harm and make the offense.

The evidence supports a finding that the infants were sick and feeble and in a helpless condition; that they were in dire need of medical attention; and that the defendant had sufficient means at her command to obtain medical services for the infants in their then sick and feeble condition. There can be no doubt that the defendant abstained from calling in assistance, though she was aware for some considerable time that the infants were in a state of imminent danger. "The most cursory examination by an experienced parent would have revealed the sickly condition of the . . . [children]; and if appellant failed to observe the obvious, it could only have resulted from . . . [her] own negligence." *Eaglen* v. *State,* 231 N.E.2d 147, 150 (Ind.). "The penal law does not require that a person actually know he is under a legal duty to act . . . ; it requires only that there be such a duty." Hall, General Principles of Criminal Law (2d Ed.), p. 205. In our view of the record, the defendant showed supine inaction in breach of her duty.

"The offence of cruelty to children is a modern creation. It was probably unknown to the law until

1802 when *R.* v. *Friend,* ((1802) Russ. & Ry. 20) a case in which a girl pauper had been 'apprenticed' to the defendants, who had failed to provide her with sufficient food and clothing, gave rise to the ruling that it was an indictable offence at common law to neglect or refuse to provide food, clothing, bedding, etc. for *any* infant of tender years unable to provide for himself." Phelan, "If Parents Do Not Call the Doctor," 110 L.J. 744 (Eng. 1960); See 1 Russell, Crime (12th Ed.), p. 402. "In England in the nineteenth century, the courts became very ready to fix liability for death on a parent who neglected to supply necessaries for his child." Hughes, "Criminal Omissions," 67 Yale L.J. 590, 621; see *Regina* v. *Wagstaffe,* 10 Cox Crim. Cas. 530; *The Queen* v. *Senior,* [1899] 1 Q.B. 283. This was so because the common law imposed certain duties by reason of the legal relation of the parties. The legal relation of the parties may have a very limited application as the source of such a duty; it certainly extended to the parent of a child of tender years. See Perkins, Criminal Law, p. 517. The common-law duty of parents and guardians to care for children who were of tender age or otherwise found to be helpless soon found statutory recognition. See Kirchheimer, "Criminal Omissions," 55 Harv. L. Rev. 615, 621.

In 1868, the first English statute on the subject was enacted. By § 37 of 31 & 32 Vict., c. 122, which is a statute dealing with the relief of the poor, it was enacted that any parent who wilfully neglected to provide adequate food, clothing, medical aid, or lodging for his child, being in his custody, under the age of fourteen years, whereby the health of such child was seriously injured, was guilty of an offense. Therefore, it became under that statute the duty of a parent to provide medical aid for his children. *The Queen* v. *Senior,* supra, 289; see *State* v. *Chenoweth,* 163 Ind. 94, 100; *People* v. *Pierson,* 176 N.Y. 201, 209.

In 1894, this act was amended by 57 & 58 Vict., c. 41, so as to provide, among other things, that "[i]f any person over the age of sixteen years . . . wilfully . . . neglects . . . such child . . . in a manner likely to cause such child unnecessary suffering, or injury to its health . . . that person shall be guilty of a misdemeanor." "It would be an odd result if we were obliged to come to the conclusion that . . . the Legislature had meant to take . . . a retrograde step [in dropping the words 'medical aid'] ; for the course of legislation . . . [shows] an increased anxiety . . . for the protection of infants." *The Queen* v. *Senior,* supra, 290; see note, 100 A.L.R.2d 483, 499; Archbold, Criminal Pleading, Evidence and Practice § 2739.

The statute upon which the charge was framed in the case at bar was first enacted in 1897. Public Acts 1897, c. 124 § 1.[2] In 1902, the act was amended by substituting the word "or" for the word "and" between the words "wilfully" and "negligently" in the first part of it. Rev. 1902, § 1160. We regard the change in the statute as purely a matter of language conformity and as not affecting the substantive scope of the statute. See *State* v. *Fahy,* 149 Conn. 577, 581, rev'd on other grounds, 375 U.S. 85; *Castagnola* v. *Fatool,* 136 Conn. 462, 468; cf. *State* v. *Dennis,* 150 Conn. 245, 248; *State* v. *Sul,* 146 Conn. 78, 88; 82 C.J.S. 675, Statutes, § 335. For nearly seventy years, the 1902 act, except for alterations in

---

[2] "AN ACT CONCERNING CRUELTY TO PERSONS. Section 1. Every person who shall torture, torment, cruelly or unlawfully punish, or wilfully and negligently deprive any person of necessary food, clothing, or shelter; and every person who, having the control and custody of any child or children under the age of sixteen years in any capacity whatsoever, shall wilfully maltreat, torture, overwork, cruelly or unlawfully punish, or wilfully or negligently deprive such child or children of necessary food, clothing, or shelter, shall be fined not more than two hundred dollars, or imprisoned not more than six months, or both."

the penalty provisions, has remained substantially unchanged.[3]

The charge preferred here is under the part of the statute which provides that "any person who, having the control and custody of any child under the age of sixteen years, in any capacity whatsoever, maltreats, . . . or wilfully or negligently deprives such child of necessary food, clothing, or shelter shall be" punished. While the statute does not mention the words "medical aid" in specific terms, we have no hesitancy in holding that such aid is embraced within the scope of its broad language.[4] See *Craig* v. *State,* 220 Md. 590, 596. "Schouler, in his work on Domestic Relations, at page 318, speaking upon the subject of parental duty in the maintenance of children, says: 'It is a plain precept of universal law that young and tender beings should be nurtured and brought up by their parents; and this precept have all nations enforced.' And again, at page 548, speaking upon the subject of what constitutes necessary maintenance, he says: 'Food, lodging, clothes, *medical attendance,* and education, to use concise words, constitute the five leading elements in the doctrine of the infant's necessaries.'" *People* v. *Pierson,* 176 N.Y. 201, 208. "Giving the statute a reasonable construction by applying the rule of necessity, it is apparent that it means the necessary food, clothing, shelter or medical attendance required for the preservation of the health and life of the child. We quite agree that the Code does not contemplate the necessity of calling a physician for every trifling complaint with which the child may be afflicted which in most instances may be overcome by the ordinary household nursing by members of the family; that a reasonable amount of discretion is

---

[3] See Rev. 1918, § 6205; Rev. 1930, § 6061; Rev. 1949, § 8368; General Statutes § 53-20.

[4] See *The Queen* v. *Senior,* [1899] 1 Q.B. 283, 290.

vested in parents, charged with the duty of maintaining and bringing up infant children; and that the standard is at what time would an ordinarily prudent person, solicitous for the welfare of his child and anxious to promote its recovery, deem it necessary to call in the services of a physician." Id., 205; see *People* v. *Edwards,* 42 Misc. 2d 930, 931.

It is argued that the court misdirected the jury in its instructions on the issue of negligence as used in the statute. The defendant insists that the burden was on the state to prove more than negligence; that it was incumbent on the state to prove "that the accused's conduct manifested extraordinary or gross indifference to harmful consequences." The court charged the jury as follows: "So we come to the definition of 'negligence.' What is negligence? Broadly speaking, negligence is a breach of duty . . . . It may be a breach of the common-law duty to exercise reasonable care to do a thing or failing to do a thing, or it may be a statutory duty to do or refrain from doing something . . . . So, you will apply the conduct of this accused at the time and place in question. This measure and rule of conduct can determine whether or not the accused did, in the conduct of a mother, use the care that a reasonably prudent person under the circumstances would have used."

"In explaining to juries the test which they should apply to determine whether the negligence, in the particular case, amounted or did not amount to a crime, judges have used many epithets, such as 'culpable,' 'criminal,' 'gross,' 'wicked,' 'clear,' 'complete.' But, whatever epithet be used and whether an epithet be used or not, in order to establish criminal liability the facts must be such that, in the opinion of the jury, the negligence of the accused went beyond a mere matter of compensation between the subjects

and showed such disregard for the life and safety of others as to amount to a crime against the State and conduct deserving punishment. . . . It is desirable that, as far as possible, the explanation of criminal negligence to a jury should not be a mere question of epithets. It is, in a sense, a question of degree, and it is for the jury to draw the line . . . ." *R.* v. *Bateman,* 19 Crim. App. 8, 11, 16; see Moreland, A Rationale of Criminal Negligence, p. 28. "The abstractions of the laws are hard to handle"; Green, "The Negligence Issue," 37 Yale L.J. 1029, 1031, n.5; for there is no such thing as negligence in the abstract. Negligence is always negligence in relation to a particular consequence. Obviously, the degree of negligence in a case of this kind can hardly be defined. It is not a slight failure of duty that will render a person criminally negligent, but a great failure in duty undoubtedly would. The line between the extremes is hard to define; it is a question that must be left to a great extent in each individual case to the common sense of the jury.

Long ago, in the leading case of *The Queen* v. *Senior,* [1899] 1 Q.B. 283, 286,[5] the jury were told that " 'neglect' was not a word of art, but a word of ordinary English, that the standard of neglect varied as time went on, and that many things might be legitimately looked upon as evidence of neglect in one generation which would not have been thought so in a preceding generation, and that regard must be had to the habits and thoughts of the day." "Whether the words in the statute, 'wilfully neglects,' are taken together, or, as the learned judge did in directing the jury, are taken separately, the meaning is very clear. 'Wilfully' means that the act is done deliberately and intentionally, not by

---

[5] This case "remains today the leading English decision on this point." Cawley, "Criminal Liability in Faith Healing," 39 Minn. L. Rev. 48, 55.

accident or inadvertence, but so that the mind of the person who does the act goes with it. Neglect is the want of reasonable care—that is, the omission of such steps as a reasonable parent would take, such as are usually taken in the ordinary experience of mankind—that is, in such a case as the present, provided the parent had such means as would enable him to take the necessary steps. I agree with the statement in the summing-up, that the standard of neglect varied as time went on, and that many things might be legitimately looked upon as evidence of neglect in one generation, which would not have been thought so in a preceding generation, and that regard must be had to the habits and thoughts of the time. At the present day, when medical aid is within the reach of the humblest and poorest members of the community, it cannot reasonably be suggested that the omission to provide medical aid for a dying child does not amount to neglect." Id., 290. "Take the rearing of infants: what the prudent parent will do in the matter of infant feeding, hygiene and general management depends partly on the state of scientific knowledge at the time, and it would be absurd to cast this into statutory form." Williams, Criminal Law (2d Ed.) § 37, p. 104; see *Oakey* v. *Jackson,* [1914] 1 K.B. 216.

"The problem of establishing the duty to take action which would preserve the life of another has not often arisen in the case law of this country. The most commonly cited statement of the rule is found in *People* v. *Beardsley,* 150 Mich. 206 . . . ; 'The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. . . . This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere

moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death.'" *Jones* v. *United States,* 308 F.2d 307, 310.

The defendant here was not charged with criminal liability for homicide by neglect. See Wharton, Homicide (3d Ed.) § 452, p. 686.[6] "Negligence, everybody agrees, in the sense of a mere want of ordinary care, is not enough to justify conviction by a jury on a charge of manslaughter." *R.* v. *Bonnyman,* 28 Crim. App. 131, 134. But she was charged with the duty to see to it that the lives of her children were not endangered. She had the means at her command to seek assistance. A word from her would have brought all the assistance she needed; it appears that as soon as her needs and wants were made known, assistance was immediately forthcoming. The negligence in this case denotes a lack of due solicitude on the part of the defendant for the lives of her infant children. " 'Neglect' of a child refers to want of reasonable care of the child, and a neglected child may be neglected either willfully or negligently." Williams, Criminal Law (2d Ed.) § 53, p. 145. It was properly left to the jury to delineate the frontier between criminal and ordinary negligence.[7]

---

[6] It has frequently been held that the failure to supply food, shelter, or medical care to a helpless wife or child, resulting in death, was manslaughter. See *Regina* v. *Conde,* 10 Cox Crim. Cas. 547; *State* v. *Smith,* 65 Me. 257; *Stehr* v. *State,* 92 Neb. 755.

[7] We are cognizant of Professor Hall's forceful argument that negligent behavior ought to be excluded from penal liability. He points out that "the exclusion of negligence from penal liability would further consistency, avoid formalism and injustice, and remove the greatest bar to the discovery of a realistic, scientific theory of criminal law." Hall, "Negligent Behavior Should Be Excluded from Penal Liability," 63 Colum. L. Rev. 632, 643. The arguments he advances in espousing his thesis of noncriminal liability for negligent behavior, however cogent and impressive, must be addressed to the legislature, and not to the courts.

In the light of the foregoing principles and viewing the charge as a whole, we are satisfied that it was legally adequate for the guidance of the jury.

The defendant also attacks the ruling upon the denial of the motion for a continuance to secure the attendance of a material witness. "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. . . . Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar* v. *Sarafite,* 376 U.S. 575, 589; see 17 Am. Jur. 2d, Continuance, §§ 3, 27, 29. "When a continuance, or a postponement, of the trial is applied for on the ground of the present impossiblity of securing the attendance of a material witness, the granting of the application, by orthodox practice, lies in the Court's discretion, *i.e.* subject to no mandatory rules, provided certain fundamental conditions exist as to materiality, diligence, and the like." 9 Wigmore, Evidence (3d Ed.) § 2595.

The record shows that this case had been pending in the Circuit Court since November 10, 1966. It was the duty of the trial judge to bring this case to trial. The case was ready for trial on March 22, 1967. Court was not in session on March 24 (Good Friday). On the final day of the trial, March 28, the defendant's counsel moved for a continuance upon the ground that he was led to believe by the

prosecution that Detective Flanigan would be in attendance and available to the defense.[8] The court granted the defendant a recess of fifteen minutes to give counsel an opportunity to secure the attendance of the witness. It was discovered that the witness was on vacation and would be unavailable that day. It also appears that the defendant's counsel issued a subpoena for Flanigan's attendance, but the process was served on the chief of police and not upon Detective Flanigan. The error was in no way attributable to the state. The defendant was represented by the same counsel throughout all the proceedings in the trial court and twice before the Appellate Division. In reviewing the action of the trial court, we may properly take into account "the length of time that accused has had the benefit of counsel." 22A C.J.S. 179 n.26, Criminal Law, § 503 (2).[9] "It has been held that diligence is not shown where accused waits to secure issuance of process for absent witnesses until the day the case is called for trial, or until the trial has actually begun, or until an unreasonably short time before trial is scheduled to begin." 22A C.J.S. 183, Criminal Law, § 503 (2).

[8] To clear this record of any misunderstanding, no promise or commitment was made or was claimed to have been made by the state's trial and appellate counsel that Detective Flanigan would be in attendance and available to the defense. Counsel for the defendant represented to the court that the former prosecuting attorney of the Circuit Court in the fourteenth circuit led him to believe that the witness Flanigan would be in court. "Lack of diligence in instituting legal process to secure the attendance of a witness will not be excused by the fact that the applicant had been informed that the witness would be present." 22A C.J.S. 189, n.37, Criminal Law, § 504; see *State* v. *Barker*, 43 Kan. 262.

[9] See note 1, supra. "Most of the cases cited . . . involve appeal by the accused from the denial of a continuance, and the finding that no reversible error was shown has usually been predicated on the entire situation before the court at the time of ruling on the motion so that normally the admission by the state is, arguably, only one of the factors going to support the trial court's decision." Note 9 A.L.R.3d 1180, 1187, n.4.

Our courts have consistently held that "[m]otions for a continuance are within the discretion of the trial court and their denial is not error unless that discretion is abused." *Rusch* v. *Cox,* 130 Conn. 26, 32; *State* v. *McLaughlin,* 126 Conn. 257, 260; *Gaul* v. *Baker,* 108 Conn. 173, 179; note, 9 A.L.R.3d 1180, 1184. Nor did the defendant take advantage of Practice Book § 156, which provides that, whenever a postponement or continuance is sought on account of the absence of a material witness and the adverse party requires it, such a motion shall be supported by an affidavit reciting "the particular facts which, it is believed, may be proved by him, with the grounds of such belief." "The court may refuse to continue the cause if the adverse party will admit that the absent witness would, if present, testify to the facts stated in the affidavit." *Teitelman* v. *Bloomstein,* 155 Conn. 653, 661. "One who fails to acquire testimony by legally available means does so at his peril." Id., 662.

We reject any claim of unconstitutionality in the denial of the motion for a continuance on the facts of this case. The constitution "does not have anything to say about the time of holding trial; which is the only question here involved. Much less does it pledge absolutely to the accused the presence of all desired persons, or any other superhuman feat. The Constitution cannot raise witnesses from the dead, nor spirit them from beds of illness or kennels of concealment. To interpret the Constitution into any such pledge is to invent (as experience has shown) a guarantee that no determined offender shall be tried . . . until he himself pleases." 9 Wigmore, Evidence (3d Ed.) § 2595, p. 605.

In *State* v. *Lee,* 69 Conn. 186, concerning a ruling denying a motion for a continuance, the court said (p. 193): "This was a matter largely within the

discretion of the trial court, and one in which this court ought not to interfere unless the record shows a very plain and clear case of the abuse of such discretion to the great prejudice of the defendant. The record shows nothing of the sort. For aught that appears the discretion vested in the trial court was wisely and fairly exercised, and the defendant took no harm from the refusal."

We are of the opinion that the defendant was required to make a stronger showing to justify the motion for a continuance. We see no abuse of discretion here.

Two rulings on evidence which are assigned as error are pressed in the argument of the appeal. During the trial, Mary L. Tustin, the custodian of the records of the Visiting Nurse Association, was called as a state's witness. Upon cross-examination, counsel for the defendant attempted to offer in evidence the official business records of the Visiting Nurse Association. The court on its own motion excluded the offer upon the ground that counsel had previously stipulated that the infants weighed four pounds and four ounces at birth. Defendant's counsel excepted, and said, "I take exception," and the court said, "Exception noted." "Neither party complied with § 226 of the Practice Book, so as to furnish the court with any clear statement of the claim with respect to the admissibility or inadmissibility of the . . . [records of the Visiting Nurse Association]. This ruling cannot be held to constitute reversible error." *Farlow* v. *Andrews Corporation,* 154 Conn. 220, 227; see *Krattenstein* v. *G. Fox & Co.,* 155 Conn. 609, 612. "If the decision of the case depended upon this point we should hold that the record did not supply sufficient information to enable us to decide that the court erred." *Coupland* v. *Housatonic R. Co.,* 61 Conn. 531, 552. Since the

essence and purpose of the offer was to establish the weight of the infants at birth—a fact which had been stipulated to by the parties—the defendant could not have been harmed by the ruling.

It was fairly within the discretion of the trial court to exclude the testimony of Albert E. Hall, an employee of the department of welfare assigned to the child welfare division. To hand the evidence he proposed to give to the jury, to be rejected or accepted according to some legal definition, and not according to its intrinsic value to their minds, might constitute error. "It is an error of policy (as well as a deviation from orthodox principle) for several reasons; in the first place, it is a needless abdication of the judicial function—of which humility we have already too much; furthermore, it adds another to the exceptions to the general rules; and finally, it cumbers the jury with legal definitions and offers an additional opportunity for quibbling over the tenor of the instructions." 9 Wigmore, Evidence (3d Ed.) § 2550, p. 503. "Even though this offer could be deemed of some relevancy, it conflicted with the rule expressed in *State* v. *Sebastian,* 81 Conn. 1, 4 . . . : 'Evidence may be relevant, and yet its relevancy may be so slight and inconsequential that to receive it would be to distract attention that ought to be concentrated on what bears [directly] on vital points, and [to] confuse rather than to illuminate the case.'" *State* v. *Wade,* 96 Conn. 238, 248; see Holden & Daly, Conn. Evidence § 67d, p. 216, and cases there cited.

There is no error.

In this opinion DEARINGTON, J. concurred.

DICENZO, J. (dissenting). I do not agree with the majority opinion. This defendant was tried on an information charging her specifically with having

committed the crime of cruelty to persons in violation of § 53-20 of the General Statutes, and such was the information that went to the jury, without further specification of the particular part or section of the statute relied on by the prosecution. Such a presentment is in compliance with Practice Book § 493. "Cruelty to persons" is the title of the statute. It is clear, however, and the majority opinion concedes, that the "charge preferred here is under the part of the statute which provides that 'any person who, having the control and custody of any child under the age of sixteen years, in any capacity whatsoever, maltreats, . . . or wilfully or negligently deprives such child of necessary food, clothing, or shelter shall be' punished." The majority opinion also concedes that the statute does not contain the words "medical aid," but nevertheless it is asserted that medical aid is within the scope of the statute. I do not agree.

Section 53-20 is a penal statute and as such is to be strictly construed. "[I]t is a fundamental rule in the construction of statutes that penal statutes must be construed strictly, or, as it is otherwise stated, strictly construed against the state, or strictly construed in favor of the persons sought to be subjected to their operations, or construed strictly against the prosecution and in favor of the person accused. The rule of strict construction means that such statutes will not be enlarged by implication or intendment beyond the fair meaning of the language used . . . ." 82 C.J.S., Statutes, § 389 (b) (1). In *Dennis* v. *Shaw,* 137 Conn. 450, 453, our Supreme Court stated that "penal statutes are to be construed strictly and not extended by implication . . . which no language of the act purports to create." The purpose of § 53-20 is to prevent cruelty. Cruelty is defined in Webster, Third New International Dictionary, as the quality of being cruel; a cruel and

barbarous deed; inhuman treatment; a disposition to give pain to others. Although § 53-20 defines some acts of cruelty, nowhere therein is it stated that failure to seek medical aid is a cruel act. To enlarge the intendment of the statute by adding the words "willfully or negligently deprives such child of medical aid," as is done in the majority opinion, is a function of the legislature and not of the courts.

It necessarily follows that the trial court's instructions to the jury in this case that the statute meant "the negligent deprivation of proper physical care" and, again, that "physical care means bodily care in case the person needs it" were inadequate and erroneous.

Another assignment of error of merit relates to the trial court's failure to instruct the jury on the principle of proximate cause. The defendant requested in writing that the court charge as follows: "To be guilty it must be found that the defendant acted negligently, and that such negligence, if it existed, was a substantial factor in causing the conditions of her twin baby girls which you have heard described in this case." The court refused to grant the request, and, moreover, nowhere in the charge is there any instruction or statement relating to proximate cause. There are several factors involved. These were premature babies who had remained in the hospital in an incubator for one month after birth. There was evidence that the defendant followed the diet instructions of the nurse from the Visiting Nurse Association. There was evidence that the defendant had been instructed not to bring the twins to the clinic until they weighed ten pounds. There was no evidence that the defendant had deprived the children of necessary food, clothing or shelter. There was evidence from the doctor who performed the autopsy that a combination of mal-

nutrition and interstitial pneumonia was responsible for Karen's death. There was evidence that no pain or discomfort was noticeable from malnutrition. There was evidence that malnutrition is a condition rather than a disease; and there was evidence that there are two causes of malnutrition, one is a kind of disease and the other having to do with food. With this state of the evidence before the jury, and the negligence, or lack of it, of the defendant the principal issue for the jury to resolve in determining whether there had been cruelty, an instruction to them on causation was of paramount importance. Failure to instruct the jury on the principle of causation was error.

"The further rule that the negligence charged must be the proximate or legal cause of the injury . . . is likewise applicable where the act or omission complained of constituted a violation of some statute or ordinance . . . ." 65 C.J.S. 1144, Negligence, § 105; see *State* v. *Campbell,* 82 Conn. 671, 675, where the court said: "The court properly said to the jury that the State must clearly show that the deceased's death was the direct result of the defendant's negligence . . . ."

In view of the above, it is unnecessary to consider the other assignments of error. I therefore conclude that the verdict should be set aside and the defendant discharged.