**Tijuana FAUNTEROY, Appellant,**

v.

**UNITED STATES, Appellee.**

**Larry JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 12166, 12273.

District of Columbia Court of Appeals.

Argued Oct. 4, 1978.

Decided April 3, 1980.

---

Wallace E. Shipp, Jr., Washington D.C., appointed by this court, for appellant Faunteroy.

Allen S. Rugg, Alexandria, Va., appointed by this court, for appellant Johnson.

Peter C. DePaolis, Asst. U.S. Atty., Washington D.C., with whom Earl J. Silbert, U.S. Atty., Washington D.C., at the time the brief was filed, and John A. Terry, Asst. U.S. Atty., Washington D.C., were on the brief, for appellee.

Before GALLAGHER and MACK, Associate Judges, and KORMAN, Associate Judge, Retired, Superior Court of the District of Columbia.*

MACK, Associate Judge:

Appellants challenge their convictions in Superior Court for involuntary manslaughter (D.C.Code 1973, § 22–2405) of their in-

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

fant son. Together, they argue that: (1) the trial court improperly instructed on the standard of criminal conduct, particularly the degree of negligence, necessary to sustain a finding of involuntary manslaughter; (2) the trial court erroneously admitted into evidence photographs of the deceased; (3) the trial court incorrectly found a legal duty on the part of appellants as parents to provide medical care for the deceased; and (4) there was insufficient evidence that a lack of food and medical care proximately caused the death of the child. We find appellants' arguments unpersuasive and so affirm their convictions.

Before trial, the court held a hearing to determine the admissibility of several photographs taken by a medical examiner during the performance of an autopsy on the deceased, Delonta Johnson, the day after death. The government was ordered to demonstrate that the photographs accurately depicted the child's condition at the time of his death, and that they were probative of the manner or cause of his death. The medical examiner testified that the body had been refrigerated a few hours after death and, except for some drying of the lips, the body was in substantially the same condition on the day of the autopsy as it had been on the previous day of death. He explained further that the child would have looked just as he did in the photographs from twelve to twenty-four hours before his death and that the signs of malnutrition and dehydration (depicted in the photographs) would have been present ten days to two weeks prior to death. He concluded that the cause of death was pneumonia associated with malnutrition, but the manner of death was undetermined.

At the conclusion of the medical examiner's testimony, the court ruled that the photographs could be admitted into evidence at trial because their probative value outweighed any prejudicial impact.

At trial, the government's evidence showed that two-month old Delonta Johnson died in the afternoon of January 8, 1976 weighing less than he had at birth. The cause of the baby's death was pneumonia associated with malnutrition. The forensic pathologist who performed the autopsy testified that, even though all of Delonta's organs weighed less than normal, he had no chronic disease or defect, such as brain damage, heart disease or gastro-intestinal track blockage, which would impede the ingestion of food. The large intestine contained dry, hard feces and test results showed an elevated blood chemistry suggesting dehydration which would take two or three days to occur. The doctor concluded that Delonta died, in part, from malnutrition. His eyes were drawn back into his head, his cheeks and belly were sunken, his ribs stuck out from his skin, his stomach contained less than an ounce of mucus material and there was little subcutaneous tissue and fat in the body; and therefore, the skin produced multiple folds which made the legs appear to be wrinkled. These physical symptoms would have been apparent to some degree approximately ten days prior to death. As a result of the underweight thymus gland, which controls the body's ability to resist infection, and the lack of nourishment the baby contracted pneumonia. At death eight-week old Delonta weighed five pounds; at birth he weighed five pounds and three ounces.

After having been shown the autopsy photographs, a pediatrician, employed by Children's Hospital, corroborated the testimony of the forensic pathologist that the cause of death was, in part, malnutrition. She stated that a normal feeding schedule for a baby would require six feedings or more per day, with a number of feedings gradually decreasing as the child got older; however, after eight weeks a premature baby, like Delonta, should receive at least five feedings. In her opinion, the effects of postpartum depression on a mother would not influence whether an infant digested his food in that a baby could obtain sufficient nutrition if it were fed adequate amounts, regardless of the mother's depression. A baby of Delonta's weight at birth

would have gained three pounds in eight weeks if he routinely had been fed only milk.

Appellants' next door neighbor testified that she visited their home about ten days to two weeks before Delonta died and saw him naked while his grandmother dried him. At that time she recommended to his grandmother that he be taken to the Congressional Heights Clinic (sometimes called Hyland School Clinic), about a ten-minute walk away, because the baby looked undernourished. The grandmother replied that she had already made that suggestion to appellant Tijuana Faunteroy. On a separate occasion the neighbor directly told Tijuana Faunteroy that the baby needed medical care.

Testimony of a pediatric nurse practitioner at the clinic established that the clinic's services were free and patients were seen either on a walk-in or appointment basis. The clinic's files showed no record of Delonta ever having been treated there.

A long-time friend of Delonta's grandmother stated on direct examination that she regularly visited appellants' home but had never seen anyone feed the baby. On one visit she found Delonta in his crib wearing wet clothes and a soiled diaper. When she undressed him she saw that his arms and legs were thin and his rib cage protruded from his skin. After washing and dressing the infant, she fed him a bottle of milk which he readily accepted, "burped" him and put him back in his crib. She then told appellant Tijuana Faunteroy that she thought the infant was "losing a lot of weight" and that he should receive medical attention; appellant merely responded that Delonta regurgitated his food. After receiving the autopsy photographs, this witness stated that Delonta looked much the same as he had when she fed and changed him.

Appellant Faunteroy's sister, Theresa Faunteroy, recalled that she saw the infant about six to eight times during his lifetime, but she never saw appellant Johnson either hold or feed the baby, nor did she ever see appellant Faunteroy burp the baby after feeding him. She too suggested to appellant Faunteroy that Delonta be taken to the neighborhood clinic after Tijuana told her the baby had a cold.

A patrolman from the Seventh District Metropolitan Police Department recounted that on January 8, 1976 he was met by a D.C. Fire Department Ambulance driver who led him into appellants' home on Atlantic Street, S.E. and upstairs to a bedroom in which Delonta lay dead in his crib. Appellant Faunteroy told the officer that she had fed the infant between 1:00 a. m. and 2:00 a. m. that morning and again between the same hours in the afternoon. Since the last feeding she had let him sleep. The officer stated further that the autopsy photographs shown to him by the prosecutor accurately depicted the condition of the child on January 8th.

With respect to appellant Johnson, the two neighbors stated they rarely saw him at home when they visited during the day because he was at work. Appellants' next door neighbor added that he was living in the house with appellant Faunteroy, and Faunteroy's mother, sister and four children. Johnson regularly visited the neighbor's home to see her son, Jerome, who, at least once, had gone to the store with Johnson to buy groceries.

At the close of the government's evidence a stipulation was read to the jury concerning the family's financial resources during this two-month period. Tijuana Faunteroy received public assistance checks for $269.95 on December 2, 1975, $296.25 on December 3, 1975, and $269.23 on January 1, 1976. On October 21, 1975 she was issued a food stamp eligibility card enabling her to buy food stamps on a regular basis, and she and Delonta were eligible for Medicaid. Appellant Johnson and Tijuana's mother worked at the Mayflower Hotel where they earned approximately $115 and $145 per week, respectively. In total, the household had a gross income of $2,888.43 with which to pay

for the living expenses of the three adults and five children.

In their defense, appellants offered the testimony of Delonta's great-grandparents who stated they had seen the infant about two weeks before he died but noticed nothing unusual about his physical appearance, except that he was rather small. An eighteen-year old neighbor and friend of appellants testified that he visited the household "practically everyday" and often saw the baby being fed and changed. None of these witnesses ever saw Delonta unclothed. Appellant Johnson's sister saw the child three times at Thanksgiving, Christmas and about five days before he died. At the last meeting she changed Delonta's diaper, fed him a bottle of milk and saw nothing wrong with him, except for a slight rash. The autopsy photographs did not in any way resemble the way he looked when she last saw the infant.

A social worker for the Child Protection Center at Children's Hospital did a social history of the family the week after Delonta's death. In the course of compiling the history she interviewed appellant Faunteroy who told her that since Delonta exhibited basically the same behavior patterns as another one of her children she was not alarmed at his size. Faunteroy told the social worker that she fed the infant on a demand schedule consisting of three or four feedings a day.

In her own behalf, appellant Faunteroy testified that Delonta often spit up his food, but nevertheless she fed him about three or four times a day as she had done with her other children. On January 8, 1976 she last saw Delonta alive at 11:30 a. m. at which time he was asleep, so rather than waking him she allowed him to sleep while she fed her other children; when she returned at approximately 1:30 p. m. he was dead.

## I.

Appellants have maintained that, in general, the trial court's instruction to the jury

on the kind of criminal conduct which constitutes involuntary manslaughter was erroneous, and that, in particular, the instruction failed to adequately define the element of culpable negligence necessary to support a finding of involuntary manslaughter.

 The trial court's instruction, which substantially tracked the language of *United States v. Bradford*, D.C.App., 344 A.2d 208 (1975), read in pertinent part:

> You may find the defendant guilty of involuntary manslaughter if you find that the defendant engaged in conduct which resulted in extreme danger to life or serious bodily injury and that he should have been aware of the danger. The Government need not prove to you that the defendant either intended to kill or even harm the deceased. It is sufficient that the Government prove to your satisfaction beyond a reasonable doubt that the defendant either was aware or should have been aware of the risk of injury to another which might result from the actions the defendant took or omitted to take. Even a death which occurs accidentally can amount to involuntary manslaughter.

In *Bradford*, we dealt with the same offense in substantially the same way, in noting:

> When a person engages in conduct which results in extreme danger to life or serious bodily injury and that person should be aware of the danger but is not, a resultant death will be involuntary manslaughter. [*Id.* at 215 (footnote omitted).]

The trial court was therefore correct in representing to the jury that involuntary manslaughter includes: (1) an "unreasonable failure to perceive the risk of harm to others," *id.* at 216, while engaging in (2) conduct resulting in extreme danger to life or of serious bodily injury. *Id.* at 215.

 The trial court was also correct in instructing the jury that such conduct must be an act or omission of "culpable [*i. e.*,

criminal] negligence"; however, it was incorrect in instructing the jury on what the term culpable negligence means. The trial court defined culpable negligence "as a failure to exercise that degree of care rendered appropriate by the particular circumstances in which a man or woman of ordinary prudence in the same situation and with equal experience would not have omitted." In so doing, the trial court failed to indicate that culpable or criminal negligence is in this jurisdiction the equivalent of "gross" negligence. *Id.* The touchstone of gross negligence is recklessness. *See Hawkins v. United States*, D.C.App., 395 A.2d 45, 47 (1978). "To establish recklessness the government must prove that the defendant's conduct was a gross deviation from a reasonable standard of care and created a serious risk of death or grave bodily injury." Criminal Jury Instructions for the District of Columbia, No. 4.26 (3d ed. 1978). In the instant case, the trial court's precise instruction on negligence described simple or civil negligence, and not culpable or criminal negligence.

■ We believe, however, the trial court's erroneous definition of culpable negligence, read in the context of the entire instruction, does not provide grounds for reversal of appellants' convictions. The trial court further instructed the jury that it could find appellants guilty of involuntary manslaughter if their conduct "resulted in extreme danger to life or serious bodily injury and that he should have been or she should have been aware of the danger." This formulation of the applicable standard of conduct closely approximates that of *Bradford, supra.* In all, the evidence at trial painted a picture of reckless omission by parents to provide the basic sustenance necessary to maintain life for an infant. This is the gross deviation from the reasonable standard of care that created a risk of death.

## II.

■ Appellants argue that the photographs taken of the deceased during the autopsy were not sufficiently probative of any material issue in the instant case, and further, that the photographs were so gruesome and inflammatory as to work prejudice against them in the minds of the trial jurors. We conclude that the trial court's decision to admit the photographs into evidence was not reversible error.

It is the general rule that photographs of a decedent are admissible as evidence in a homicide case at the discretion of the trial court, where they are not introduced solely to inflame the jury. *Pittman v. United States*, D.C.App., 375 A.2d 16, 19 (1977); *Womack v. United States*, D.C.App., 339 A.2d 37, 38 (1975); *Harried v. United States*, 128 U.S.App.D.C. 330, 336, 389 F.2d 281, 287 (1967). In these cases the homicide at issue was murder. However, we see no reason why the rule may not fairly be applied to a case on the lesser charge of involuntary manslaughter. In applying the rule to the instant case, we note that the photographs were not proffered to arouse jury prejudice. They were probative of the victim's identity, his condition at death, and the cause of death—all relevant issues in a case of homicide. The government laid a foundation for their introduction through the testimony of the autopsy surgeon and we see no abuse of discretion in the trial court's ruling them admissible. "[I]n the absence of a showing of abuse of discretion, the trial court's ruling will not be disturbed on appeal." *Maxwell v. United States*, 368 F.2d 735, 739 (9th Cir. 1966); *accord, March v. United States*, D.C.App., 362 A.2d 691 (1976).

## III.

Appellants next argue that there exists no parental duty at law in the District of Columbia to provide medical care for dependent minor offspring. We disagree.

■ The cases of several state courts hold there is "[a] common law natural duty of parents to provide medical care for their minor dependent children." *State v. Wil-*

*liams,* 4 Wash.App. 908, 915, 484 P.2d 1167, 1172 (1971); *accord, Singleton v. State,* 33 Ala.App. 536, 542, 35 So.2d 375, 380 (1948); *State v. Clark,* 5 Conn.Cir. 699, 702, 261 A.2d 294, 297 (1969); *State v. Staples,* 126 Minn. 396, 398, 148 N.W. 283, 284 (1914); *State v. Mason,* 18 N.C.App. 433, 434, 197 S.E.2d 79, 80 (1973). Such a duty does not arise out of any particular state statute. *State v. Williams, supra.* Since no statute for the District operates to specifically abolish it, this duty remains the common law of this jurisdiction. D.C.Code 1973, § 49–301. Appellants, therefore, were under a common law duty to provide medical care for their infant son Delonta.

We hold, furthermore, that appellants were under a statutory duty to provide such medical care, in the context of D.C.Code 1973, § 22–902. That provision states the following:

> Any person within the District of Columbia, of sufficient financial ability, who shall refuse or neglect to provide for any child under the age of fourteen years, of which he or she shall be the parent or guardian, such food, clothing, and shelter as will prevent the suffering and secure the safety of such child, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be subject to punishment by a fine of not more than one hundred dollars, or by imprisonment in the workhouse of the District of Columbia for not more than three months, or both such fine and imprisonment.

We think it clear that the duty of providing medical care, while not literally expressed in this statutory provision, is covered by its sweep. A Connecticut statute, Conn.Gen. Stat. § 53–20, similar in wording to D.C. Code 1973, § 22–902, declared as criminal conduct by a controlling adult which deprived a child of "necessary food, clothing, or shelter." The Connecticut court held this statute encompassed conduct where the adult(s) failed to provide medical care for the child. *State v. Clark, supra,* 5 Conn.Cir. at 702, 261 A.2d at 298. While that statute

did not specifically mention the words "medical aid," the Connecticut court in *Clark* had "no hesitancy in holding that such aid is embraced within the scope of its broad language." *Id.* (footnote omitted). In reviewing D.C.Code 1973, § 22–902, we likewise have no hesitancy in finding that the duty of parents to provide medical care for their dependent minor children is a statutory one in this jurisdiction.

We do not believe it an overly expansive construction of D.C.Code 1973, § 22–902, to hold that the traditional elements of parental duty—*i. e.,* the requirements of providing food, clothing, and shelter—imply, in a contemporary context, the additional requirement of providing medical care. Logic is not strained by a decision that medical care constitutes one of the necessities in the life of an infant, necessities which have always fallen under the rubric of food, clothing, and shelter.

### IV.

Appellants contend finally that there was insufficient evidence for the jury to find, beyond a reasonable doubt, that Delonta Johnson's death was proximately caused by the lack of food and medical care. We disagree. There was never any dispute in the instant case as to the fact that Delonta Johnson died of bronchial pneumonia associated with malnutrition and dehydration. The government offered evidence that no physiological problem existed to prevent the deceased's taking in an adequate food supply. The government also offered evidence that the deceased had suffered from the symptoms of malnutrition over a fairly long period of time, considering the shortness of his life. Finally, the government offered evidence as to the deceased's deteriorating condition as witnessed by friends and relatives of the appellants. We believe that, given the government's evidence, it was proper for the jury in the instant case to find that the failure of appellants to provide their infant son with needed food, and in view of his condition, to subsequently

provide him with medical care from a nearby free health clinic, led to the child's death. We are not persuaded that the circumstantial character of the government's evidence on the issue of proximate cause rendered that evidence insufficient for a jury finding that proximate cause did in fact exist.**

*Affirmed.*

---

** We note that the manslaughter conviction of a parent for the death of her child from malnutrition was affirmed where, as in the instant case, "the evidence did not establish that the malnutrition resulted from the child being starved to death." *Nozza v. State*, 288 So.2d 560, 562 (Fla.App.1974). The evidence of proximate cause in *Nozza*, as in the instant case, pointed to the deteriorating condition of the child prior to death, and to the irregular feeding of him by the mother. "From the evidence, the jury undoubtedly reached a conclusion that appellant's neglect of her parental duties had resulted in the malnutrition causing Dean Nozza's death." *Id.* We find that the similar evidence in the instant case was sufficient for the jury here to have formed a similar conclusion to the one reached in *Nozza*.