Filed 7/11/14  P. v. Valdez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C070070 |
| Plaintiff and Respondent, | (Super. Ct. Nos. MF029584A, MF029584B) |
| v. | |
| FERNANDO VALDEZ et al., | |
| Defendants and Appellants. | |

Believing he had been given less marijuana than he paid for, defendant Jeremy Delphin, with defendant Fernando Valdez, went to the home of Angelique Hewitt, the drug seller's mother, and shot and killed her.  A jury found Delphin guilty of first degree murder (Pen. Code, § 187)[1] and found true the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) and the allegation that he personally discharged a firearm causing

---

[1] Further undesignated statutory references are to the Penal Code.

1

death (§ 12022.53, subd. (d)).  The jury found Valdez guilty of second degree murder (§ 187) and found true the allegation that a principal was armed with a firearm (§ 12022, subd. (a)).  The trial court sentenced Delphin to life without the possibility of parole plus 25 years to life.  The court sentenced Valdez to 16 years to life in prison.

On appeal Valdez contends:  (1) it was error not to instruct on the lesser offenses of voluntary and involuntary manslaughter; (2) it was error to instruct on second degree murder; and (3) there was no substantial evidence of second degree murder.  Valdez also purports to join Delphin's contentions, but does not separately argue them.  Delphin contends:  (1) the trial court erred in declining to investigate when Delphin's new counsel declared a doubt as to his competency; and (2) it was error to instruct with CALCRIM No. 702.  Finding no prejudicial error, we shall affirm.

**FACTS**

Angelique Hewitt lived in Lathrop with her partner Janice Johnson, Johnson's two children, and Hewitt's young son.  Hewitt's older son Lloyd Galtney visited often from the Bay Area.  Defendant Valdez had become friendly with Hewitt after he and his brothers stopped someone from attacking Hewitt's young son.  Valdez came by often and drank beer and smoked marijuana with Hewitt.

On April 2, 2006, Galtney was visiting his mother when Valdez called and said a friend wanted to buy some marijuana.  Galtney drove to a location about five minutes away to make the sale.  He met Valdez and defendant Delphin and sold Delphin a half of an ounce of marijuana for $125-$150.

Delphin was not happy with the sale; he weighed the marijuana and believed it was a few grams short.  He wanted to go talk to the man who sold it.  Valdez called Galtney and told him Delphin was not satisfied.  Valdez told Galtney that Delphin wanted to talk to him and show him the marijuana.  Galtney was not going to do anything; in his view it was a "done deal."

2

About 30 minutes later, Delphin arrived at Hewitt's with Gary Hansen. Delphin approached Galtney while Hansen stayed back. Delphin had the marijuana and a scale. Galtney told him the marijuana had been tampered with. Delphin wanted his money back, but Galtney told him there were no refunds. Delphin then got "aggressive," and Galtney "chastised" him. The two men fought. Hewitt came out and broke up the fight. She told Delphin to leave. Delphin made the hand sign of a gun and said he would be back. Hansen heard Galtney say he was going to get a "strap," meaning a gun.

Hewitt also made Galtney leave. She later called him to complain about what had happened.

Hansen and Delphin returned to Delphin's. Valdez arrived in his car. Delphin wanted to do something; he wanted to "scare the guy." Delphin got two shotguns from the garage, loaded them, and put them in Valdez's car. He and Valdez left. Before they left, Valdez asked Delphin if he really wanted to "shoot at him." Hansen heard Delphin say no, he just wanted to "see if he's really going to pull out a strap."

Valdez went to Hewitt's door and rang the bell. Hewitt saw it was Valdez and stopped Johnson from answering the door. She said she would go because the situation concerned her child. Hewitt told Valdez she did not want problems and Valdez said he just wanted to talk. Hewitt stepped outside and locked the door. Delphin came around the garage and shot Hewitt.

Hewitt sustained two gunshot wounds: one in the face from four to six feet away and one in the shoulder from a distance of three feet. Both shots were fatal.

## DISCUSSION

### I

*Instructions on Voluntary and Involuntary Manslaughter*

Valdez requested an instruction on second degree murder and the trial court agreed. The court asked counsel about manslaughter instructions. Counsel argued that Valdez's act of driving Delphin, whom he described as a "lunatic," to Hewitt's could be

3

criminal negligence and manslaughter. The trial court responded that scenario would result in a not guilty verdict; it could be manslaughter only if there were heat of passion. The court declined to give an instruction on voluntary manslaughter.

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. [Citations.] That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. [Citations.] To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 744-745.)

A. *Voluntary Manslaughter*

Valdez contends the trial court erred in failing to instruct on both voluntary and involuntary manslaughter. Manslaughter is the "unlawful killing of a human being without malice." (§ 192.) In California, there are two recognized theories under which an intentional killing is reduced from murder to voluntary manslaughter: a killing resulting from a sudden quarrel or in the heat of passion, or a killing committed while acting in imperfect self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199.)

Valdez relies on a third theory of voluntary manslaughter suggested in *People v. Garcia* (2008) 162 Cal.App.4th 18 at page 31. In *Garcia*, the defendant and victim were involved in an altercation. When the victim lunged towards the defendant, the defendant struck the victim with the butt of a shotgun he was holding, causing the victim to fall and hit his head on the sidewalk, ultimately leading to his death. (*Id.* at pp. 22-23.) The defendant was convicted of voluntary manslaughter and on appeal contended that the trial court should have instructed on involuntary manslaughter because there was substantial evidence that the killing "was committed without malice and without either an intent to

4

kill or conscious disregard for human life and therefore, was neither murder nor voluntary manslaughter." (*Id*. at p. 26.) The court rejected this contention, stating that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Id*. at p. 31.)

Valdez contends voluntary manslaughter is established if, in the commission of an inherently dangerous felony, such as assault with a firearm, an unintentional killing is committed without malice. He argues a reasonable juror could have concluded that Valdez did not know Delphin's intent to kill Hewitt and did not intend to assist that crime. That juror, however, could have found that Valdez's act of driving Delphin and two shotguns to Hewitt's house was an inherently dangerous act and a reasonable person would have appreciated the risk of death, even though Valdez did not. Valdez asserts that scenario would establish voluntary manslaughter under *Garcia*.

As Valdez recognizes in his reply brief, after his opening brief was filed the California Supreme Court disapproved *Garcia*. (*People v. Bryant* (2013) 56 Cal.4th 959, 970.) Our high court held: "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Ibid*.) Valdez concedes, and we agree, that after *Bryant* there is no basis for an instruction on voluntary manslaughter.

B. *Involuntary Manslaughter*

Involuntary manslaughter is committed when the defendant acts with criminal negligence but without an intent to kill or conscious disregard of life. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) "Through statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony." (*Ibid*.)

5

Valdez contends the evidence supported a verdict of involuntary manslaughter. He argues, "The jury could have found that the act committed by Valdez was not inherently dangerous, and that he did not subjectively appreciate and consciously disregard the risk the act would result in death." In his opening brief, Valdez fails to identify the act he claims was not inherently dangerous, making it difficult to respond to his contention. In his reply brief, however, he identifies the act as transporting a loaded firearm in violation of section 25850. That offense is either a felony or misdemeanor depending on the circumstances. (§ 25850, subd. (c).) Valdez argues the record does not show any circumstances that would make the crime a felony, and that even if it were a felony, it is not an inherently dangerous one.

But Hewitt was *not* killed "in the commission of" transporting a loaded gun. When the transportation was complete and Valdez and Delphin had arrived at Hewitt's house, Hewitt was still alive. It was the act of shooting her that caused her death. Valdez fails to show a valid theory of involuntary manslaughter. Accordingly, the trial court did not err in failing to instruct on that crime.

II

*Instruction on Second Degree Murder*

Valdez contends the trial court erred in instructing on second degree murder because there was no evidence to sustain a conviction for that offense. Recognizing that his own counsel requested the instruction, he contends trial counsel's request is not invited error because invited error requires that counsel express a deliberate tactical purpose for the instruction. We find the invited error doctrine applies.

"When a defense attorney makes a 'conscious, deliberate tactical choice' to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error." (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.) "In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the

invited error rule.  [Citations.]"  (*People v. Coffman* (2004) 34 Cal.4th 1, 49.)  "In California it is established that when a lesser included offense instruction is requested by the defense, the invited error doctrine precludes objection to that instruction on appeal." (*People v. Barnard* (1982) 138 Cal.App.3d 400, 409 (*Barnard*).)

Here, we find counsel had "a clearly implied tactical purpose" for requesting an instruction on second degree murder.  The instruction not only offered the jury a less serious alternative to first degree murder (see *Barnard, supra*, 138 Cal.App.3d at p. 410, fn. 5), but also permitted Valdez to avoid the lying-in-wait special circumstance if the jury found him criminally liable for Hewitt's murder.  Because any error in giving the instruction was invited, the contention is forfeited.

### III

### *Sufficiency of the Evidence*

Valdez contends substantial evidence does not support the verdict because there was no evidence that he "knew of Delphin's intent to commit murder and intentionally assisted Delphin in that crime."  He contends the evidence shows that he knew, at most, that Delphin intended to use a gun to frighten Galtney or Hewitt and get his money back. Valdez concedes this showing would be sufficient for murder under the natural and probable consequence doctrine, but points out that the People did not rely on that theory and the jury was not instructed on it.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Substantial evidence supports the jury's verdict that Valdez aided and abetted murder. The evidence established that Valdez knew Delphin was unhappy about the marijuana sale and wanted to do something about it. Valdez knew Delphin intended to go to Hewitt's house with two loaded shotguns. Further, Valdez suspected that Delphin intended violence because he asked Delphin if he really wanted "to go over there and shoot at him?" Despite this knowledge, Valdez willingly drove Delphin to Hewitt's, left Delphin with the guns while he went to the front door, and convinced Hewitt to come out of the house. The jury could have reasonably inferred that Valdez knew Hewitt would come outside; due to their relationship, it was reasonable for Valdez to expect she would agree to talk to him. Valdez did not warn Hewitt that Delphin was present and armed, nor did he try to talk with her out of the presence of Delphin. The jury could have found that Valdez expected Delphin would fire the shotgun and moved out of the way before the shots were fired because he was not struck with the shotgun pellets. Further, instead of helping his friend Hewitt after she was shot, as would be expected if the shooting were a surprise, Valdez fled and disposed of the guns and car.

In arguing that the evidence is insufficient, Valdez relies on Hansen's testimony that Delphin just wanted to "scare the guy." Also, Hansen testified that when Valdez questioned Delphin if he really wanted to shoot, Delphin replied that he just wanted to see if Galtney really had a gun. This testimony reflected Hansen's interpretation of Delphin's intent, apparently based on his belief Delphin was telling the truth and that Delphin would not shoot someone over such a minor matter. Hansen testified he did not know Delphin was going to shoot anyone and he thought the shooting over a few grams

8

of marijuana was "stupid." The jury was not required to accept Hansen's view of Delphin's intent, particularly in light of how the shooting occurred and Valdez's part in it. (*People v. Langley* (1974) 41 Cal.App.3d 339, 348 ["[T]he trier of fact may reject a part of the testimony of a witness while believing other portions of his testimony."].)

IV

*Failure to Investigate Counsel's Doubt as to Delphin's Competency*

A. *Background*

In April 2007, Delphin's counsel declared a doubt as to Delphin's competency to stand trial pursuant to section 1368. The court appointed Drs. Hart and Antwon to evaluate Delphin. When Dr. Antwon proved unavailable, the court appointed Dr. Rogerson.

Dr. Hart reported that Delphin claimed he was working for the government doing top-secret autopsies on aliens. The current charges were filed after Delphin helped an alien escape. Dr. Hart found Delphin's story was either delusional or more likely a fanciful fabrication designed "to deter his case into a state hospital setting." He found Delphin had no other discernible signs of mental illness. Delphin understood the charges and could assist counsel "if he chooses to do so." Dr. Hart found that Delphin was competent to stand trial.

Dr. Rogerson reported that Delphin had a history of mental illness and treatment; he had been diagnosed with a psychotic disorder. While Delphin knew and understood the nature of the proceedings, he was not able to assist counsel; he needed "aggressive treatment."

Delphin's counsel told the court that Dr. Hart had been given additional information about Delphin's mental health history after completing his report. Dr. Cavanaugh, acting as a consultant for the defense, had suggested the 1368 proceedings and would concur with Dr. Rogerson's assessment. Based on the reports and the parties'

9

stipulation as to Dr. Cavanaugh's concurrence, the court found Delphin not competent to stand trial. The court remanded Delphin for treatment at Napa State Hospital.

In August 2008, Napa State Hospital issued a certificate of mental competency as to Delphin. The assessment noted that Delphin spoke of aliens when discussing the charges against him but exhibited no other signs of mental illness or distress. The treatment team was of the opinion that Delphin was "malingering symptoms of mental illness" and recommended that Delphin be returned to court as competent to stand trial.

Shortly after this assessment, Delphin's counsel withdrew and the trial court appointed new counsel.

On September 15, 2008, the trial court announced that Delphin had been returned from the hospital and certified mentally competent. The proceedings against Delphin were reinstated.

In April 2009, Delphin's new counsel told the court that although he had hoped Delphin's condition would improve, Delphin continued to suffer from the same psychological condition and needed to be re-evaluated under section 1368. Counsel believed that Delphin's continuing confinement in a solitary cell compounded his disability. The court asked if there was any change in Delphin's condition since he had been declared competent to stand trial. Counsel said no, but asserted that Delphin was "utterly unable" to assist in his defense. The court noted the prior assessment had found Delphin was malingering. Since there was no difference in his condition, the court found no legitimate basis to examine Delphin, referring to that decision as "discretionary." Counsel said Delphin had told him he was hearing voices, spoke of aliens, and did not have a grip on reality. "Out of exasperation" counsel had "just given up." Counsel asked if he should proceed to trial with the court's ruling that Delphin was fine and fit. The court said yes. The court acknowledged that Delphin was not assisting his attorney, but found it was intentional and not due to some mental defect or disease.

10

At a proceeding a few months later, Delphin continually interrupted with inappropriate or nonsensical remarks. His counsel again expressed concerns; Delphin had engaged in a running conversation with himself since he entered the courtroom. Also, Delphin had lost 40 pounds. Counsel renewed the motion under section 1368. The court again denied the motion, finding that Delphin had already been examined and found to be malingering.

Just before jury selection, Delphin again behaved inappropriately, laughing and making comments. Counsel told the court Delphin had stopped taking his medication and had refused to come out of his cell to see the investigator, although he came out the next day. The court noted Delphin had not made any audible sounds until counsel pointed out his behavior; the court believed Delphin was "faking it." Counsel said Delphin "was exhibiting certain signs and behaviors in the hallway."

The court advised Delphin it was in his best interests to make a good impression to the jury and the court would not permit him to act out in front of the jury. Counsel wanted Delphin excused from the courtroom during jury selection. The court was uncertain if it could do that. Delphin continued to interrupt, distracting his attorney. After further interruptions, Delphin was removed from the courtroom.

The trial court concluded Delphin could waive his appearance during jury selection. The court accepted Delphin's waiver. Subsequently, Delphin indicated that he wanted to return. His counsel warned him that the jury would hold inappropriate behavior against him. The court questioned Delphin and asked if there would be further problems; Delphin said no. The court again warned him he would be removed if there were any interruptions or disruptions. Delphin was present throughout trial; at the conclusion the court put on the record that Delphin had "conducted himself in a perfect manner."

B. *The Law*

"A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

"When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. [Citation.] The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' [Citations.] [¶] When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" (*People v. Jones* (1991) 53 Cal.3d 1115, 1152-1153.) When "a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state." (*Id.* at p. 1153.)

More is required to raise a doubt as to defendant's competency than mere bizarre actions or statements. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 403.) Disruptive conduct and courtroom outbursts do not necessarily demonstrate that defendant is unable to understand the proceedings or assist in his defense. (*People v. Mai* (2013) 57 Cal.4th 986, 1033.) In *People v. Medina* (1995) 11 Cal.4th 694, our Supreme Court found defendant's cursing and disruptive behavior "displayed an unwillingness to assist in his defense, but did not necessarily bear on his *competence* to do so, or reflect a substantial

12

change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence." (*Id*. at p. 735.)

"A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) " 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' [Citations.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 727, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069.) The trial court's decision will be upheld if substantial evidence supports it. (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

C. *Analysis*

Delphin contends his second trial counsel made a sufficient showing to require the trial court to reinvestigate his competency. He cites the following points counsel raised with the court: Delphin was housed alone in administrative segregation; his symptoms persisted; counsel had "given up" and both counsel and the defense investigator had difficulty with Delphin; Delphin had lost 40 pounds and ceased taking his medicine; he once refused to leave his cell and acted "goofy" both in court and in the hallway.

Much of this evidence simply shows bizarre behavior, which is insufficient to raise a doubt as to Delphin's competence. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) Significantly, counsel never indicated that Delphin's condition had changed or worsened, only that it did not improve as he had hoped and that he was frustrated in dealing with Delphin. None of this evidence contradicts the trial court's finding, based on the report from Napa State Hospital and the court's own observations, that Delphin was malingering and his failure to assist in his defense was intentional. His outbursts were often timed to draw the most attention. Tellingly, once it was clear that the trial was proceeding, the outbursts and bizarre behavior stopped. Nothing that counsel pointed out

13

to the court reflected a change in Delphin's condition from when he had been found competent or cast a serious doubt on that conclusion.

Delphin contends the trial court applied the wrong standard for determining if a second competency hearing was required because it indicated its decision was discretionary. We note that in some instances the decision to conduct a competency hearing *is* discretionary. When the evidence casting doubt on an accused's present competence is less than substantial, it is within the trial court's discretion whether to order a competency hearing. (*People v. Welch* (1999) 20 Cal.4th 701, 742.) In any event, Delphin failed to show a substantial change in circumstances as to his competency so as to require a second hearing merely because his second lawyer declared a doubt.

V

*CALCRIM No. 702*

Delphin contends the trial court erred in instructing the jury with CALCRIM No. 702 because it erroneously informed the jury that the People did not have to prove the actual killer acted with intent to kill for the special circumstance of murder by means of lying in wait to be true. While first degree murder by means of lying in wait requires "only a wanton and reckless intent to inflict injury likely to cause death," the lying-in-wait special circumstance requires the intent to kill. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149; see also *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 309-310.) Although another instruction correctly informed the jury that the special circumstance required an intentional killing, Delphin contends the conflicting instructions created prejudicial error. We disagree.

A. *The Instructions on the Lying-in-Wait Special Circumstance*

The trial court gave two instructions on the lying-in-wait special circumstance. One applied to the actual killer and the other applied to an accomplice.

As to the accomplice, the court instructed the jury using the language of CALCRIM No. 702 in part as follows: "If you decide that a defendant is guilty of first-

14

degree murder but was not the actual killer, then, when you consider the special circumstance of murder while lying in wait, you must also decide whether the defendant acted with the intent to kill.  In order to prove this special circumstance for a defendant who is not the actual killer, but who is guilty of first-degree murder as an aider and abettor, the People must prove that the defendant acted with the intent to kill.  *The People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true.*"  (Emphasis added.)

The court also instructed with CALCRM No. 728, which addresses the special circumstance as applied to the actual killer.  The court instructed in part as follows:  "A defendant is charged with a special circumstance of murder committed by means of lying in wait in violation of Penal Code Section 190.2(a)(15).  To prove that this special circumstance is true, the People must prove that:  [¶]  1.  *The defendant intentionally killed Angelique Hewitt*;  [¶]  And, [¶] 2 .  The defendant committed the murder by means of lying in wait.  [¶]  A person commits a murder by means of lying in wait if:  [¶]  1.  He concealed his person from the person killed;  [¶]  2.  He waited and watched for an opportunity to act;  [¶]  3.  Then he made a surprise attack on the person killed from a position of advantage;  [¶]  And,  [¶]  4.  *He intended to kill the person by taking the person by surprise.*"  (Emphasis added.)

B.  *The Law and Analysis*

It is well established in California that we determine the correctness of jury instructions from the entire charge to the jury and not by considering only parts of an instruction or a particular instruction.  (*Bolin, supra,* 18 Cal.4th at p. 328.)  In assessing whether an instructional error occurred, the test is "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire trial record and the arguments of counsel."  (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

15

"The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) We presume that the jury properly disregarded inapplicable instructions. (See *People v. Chavez* (1958) 50 Cal.2d 778, 790; *People v. Hairgrove* (1971) 18 Cal.App.3d 606, 609.)

Here, CALCRIM No. 702 misstated the law as to the People's burden in Delphin's case to prove his intent to kill as part of the lying-in-wait special circumstance. As the parties recognize and the use note indicates, this instruction should not have been given in this case. This instruction expressly provided that it applied only if the defendant was not the actual killer ("If you decide that a defendant is guilty of first-degree murder but was not the actual killer").

Here, the record established that the jury found Delphin was the actual killer because the jury found true the allegation that he discharged a firearm causing death. Thus, the jury would not have looked to CALCRIM No. 702 to determine whether the special circumstance was true as to Delphin. Instead, the jury would have looked to CALCRIM No. 728, which applied to the actual killer. As we have emphasized *ante*, this instruction stated twice that the killing must be intentional. Construing the instructions as a whole and applying the well-established presumption that the jury followed the instructions which appropriately applied to its factual findings, there is not a "reasonable likelihood" that the jury found the lying-in-wait special circumstance true as to Delphin without finding that he intentionally killed Hewitt.

16

## DISPOSITION

The judgment is affirmed.


                                                 _____DUARTE_____, J.


We concur:


_____HULL_____, Acting P. J.


_____HOCH_____, J.